STATE OF CONNECTICUT *v.* BRUCE BOLES
(14263)

PETERS, C. J., CALLAHAN, GLASS, BORDEN and BERDON, Js.

Argued May 5—decision released August 18, 1992

*Susan M. Hankins,* assistant public defender, with whom, on the brief, was *G. Douglas Nash,* public defender, for the appellant (defendant).

*Timothy J. Sugrue,* assistant state's attorney, with whom, on the brief, was *John M. Connelly,* state's attor-

ney, and *Robert Brunetti,* assistant state's attorney, for the appellee (state).

CALLAHAN, J. The defendant, Bruce Boles, was charged with the crime of murder in violation of General Statutes § 53a-54a (a).[1] The charge arose out of the bludgeon slaying of a woman, in May, 1989, in Waterbury. After a jury trial, the defendant was found guilty of the charged offense. He was thereafter sentenced by the trial court to a term of imprisonment of fifty years. He has appealed from the judgment of conviction to this court pursuant to General Statutes § 51-199 (b).

In his appeal, the defendant claims that the trial court improperly: (1) instructed the jury on the essential element of intent to cause death in violation of his state and federal constitutional rights; (2) excluded evidence of the exculpatory statements of a third party in violation of his constitutional rights and the rules of evidence; (3) excluded evidence of a third party's possible culpability in violation of his constitutional right to present a defense; and (4) failed to give an accomplice charge in regard to the testimony of a witness for the state. We affirm the judgment of the trial court.

The jury could reasonably have found the following facts. On May 19, 1989, the partially decomposed body

---

[1] General Statutes § 53a-54a provides in pertinent part: "MURDER. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

of a young woman was found in a wooded area behind the Long Hill Road recreational center in Waterbury. Her body was unclothed, except for a coat pulled over her head and shoulders, and had probably been where it was discovered for a period of between four days to two weeks. Through fingerprints the victim was identified as someone known as "Mecca," a prostitute and drug user. As a result of an autopsy, the medical examiner determined the cause of death to have been blunt traumatic injury to the head, probably caused by three or more severe blows with an instrument consistent with a small crowbar.

The jury could also have found, from the testimony of a witness, Sherrie Washington, that, on an evening in early May, 1989, at approximately 10:30 p.m., Washington, Elan Howard, the victim, the defendant, and others were in the hallway of a building in a housing project at 127 Harris Circle in Waterbury. The victim had gone to the building to buy drugs. While there, she encountered the defendant, who claimed that the victim was indebted to him and confiscated her drug money. In response, the victim screamed at the defendant that she was "dope sick" and needed the drugs. At this point, Howard asked the defendant if the defendant wished him to attempt to quiet the victim down. The defendant, in response, said "No," that he could "handle it," and that she was "really going to be quiet now." The defendant then obtained a small crowbar from a utility closet. With the crowbar, he struck the victim on the left side of the head, causing her to fall back against Howard. He then struck the victim two more blows, the last while she was lying on the floor. Thereafter, frightened, Washington ran from the building. From a position outside 127 Harris Circle, however, she saw the defendant and another man, whom she believed to be Howard, carry the victim's body out of the building and place it in the trunk of an

automobile and drive away. The next day the defendant threatened to kill Washington if she disclosed what she had seen the previous night.

Howard testified that he had been present in the hallway at 127 Harris Circle on the night the victim had been killed and that he had seen the defendant inflict the fatal blows. Howard also acknowledged that he had assisted the defendant in carrying the victim's body out of the building and placing it in the trunk of a car. He said he had done so, however, only after having been threatened with death by the defendant if he refused. He also stated that he had been again threatened as he was about to leave after placing the body in the trunk. He then went with the defendant and assisted in removing the body from the automobile, but as soon as the opportunity presented itself he dropped the body and ran.

Further, a statement given by the defendant to Detective Sergeant Joseph Morgan of the Waterbury police department on February 27, 1990, was read to the jury. In his statement the defendant told Morgan that he had been present at 127 Harris Circle the night the victim had been killed and had witnessed the fatal assault. He said, however, that another man had committed it. He then described, and identified from a photographic array, Roger "Eli" Williams as the person who had assaulted and killed the victim with what the defendant said were blows to the head with a hammer.[2]

The state, however, produced as a witness Berone Richardson, an employee of the department of corrections. Richardson testified that Williams had been in the custody of the department of correction at the time in question and had, in fact, been continuously confined from December 28, 1988, until the time of trial.

---

[2] The defendant did not testify at trial.

Other evidence will be related as it becomes relevant to particular issues.

## I

The defendant first claims that the trial court, in a portion of its charge, improperly instructed the jury that it could find that the defendant intended to cause the victim's death if it simply found that the defendant's conduct had been the proximate cause of her death. He argues that the trial court, by its instruction, substituted causation for intent, thereby misleading and confusing the jury on the issue of intent to cause death, an essential element of the crime of murder. He contends that the court's instruction violated his constitutional right to due process by relieving the state of the burden to prove, in order to obtain a murder conviction, that the defendant had intended to cause the victim's death. He maintains that, despite the fact that no exception was taken at trial to the controverted segment of the court's charge, he is entitled to review of this claim under *Evans* and *Golding*[3] and the plain error doctrine. We disagree.

The instruction of the trial court about which the defendant complains occurred directly after the court had given a correct instruction on the element of intent and while the court was explaining causation. The instruction in question reads as follows:

"Now, the *second* element is that the defendant, acting with that intent to cause the death of another person, caused the death of that person. This means that the defendant's conduct was the proximate cause of the victim's death. An act or omitted act is a proximate cause of death when it substantially and materially contributes that natural continuous sequence unbroken by

---

[3] *State* v. *Evans,* 165 Conn. 61, 327 A.2d 576 (1973); *State* v. *Golding,* 213 Conn. 233, 567 A.2d 823 (1989).

any intervening cause to the resulting death. It is the cause without which the death would not have occurred and it's the predominating cause, the substantial factor, from which death followed as a natural, direct, and immediate consequence. It's not necessary that the particular kind of harm that results from the defendant's act be intended by him *or* the death or injury caused by the defendant's conduct is a foreseeable and natural result of that conduct. The law considers the chain of legal causation unbroken and holds the defendant criminally responsible."[4] (Emphasis added.)

The section of the trial court's instruction in question could only be misinterpreted as informing the jury that to find the defendant guilty of the victim's murder it had only to find proven that the defendant was the source of the conduct that caused her death, if we were to view the charge in isolation from what imme-

[4] The instruction given is substantially similar to the suggested instruction contained in D. Borden & L. Orland, Connecticut Criminal Jury Instructions (1986) § 8.1. The significant deviation is the "or" substituted for "where" in the next to the last sentence quoted above. It appears that the deviation was either a misstatement by the trial judge or an error in transcription. The suggested charge reads as follows: "The second element is that the defendant, acting with that intent to cause the death of another person, caused the death of that person (or a different person). (It is not necessary for a conviction of murder that the state prove that the defendant intended to kill that person whom he did in fact kill. It is sufficient if the state proves that he had the intent to kill a person and that, acting with that intent, he in fact killed a different person.) This means that the defendant's conduct was the proximate cause of the victim's death. An act or omission to act is the proximate cause of death when it substantially and materially contributes in a natural and continuous sequence, unbroken by an intervening cause, to the resulting death. It is the cause without which the death would not have occurred, and it is the predominating cause, the substantial factor, from which death followed as a natural, direct and immediate consequence. It is not necessary that the particular kind of harm that results from the defendant's act be intended by him. *Where* the death or injury caused by the defendant's conduct is a foreseeable and natural result of that conduct, the law considers the chain of legal causation unbroken and holds the defendant criminally responsible." (Emphasis added.) D. Borden & L. Orland, supra, p. 222.

diately preceded it. Viewing this portion of the charge in such isolation, however, would be completely unjustified, because immediately prior to it the court instructed the jury that "the *first* element [of the crime of murder] is that the defendant had the intent to cause the death of another person. So now, I'm going to give you the law as it applies to the concept of intent." (Emphasis added.) The court then fully and accurately charged the jury on the element of intent. It then stated: "Now, the *second* element is that the defendant, acting with *that* intent to cause the death of another person, caused the death of that person." (Emphasis added.) This was followed by the charge on causation of which the defendant complains.

In the context of the court's instructions concerning intent and causation, it would strain reason to believe that the jury could have heard the challenged instruction as eliminating the element of intent. We believe that construed reasonably in context the meaning conveyed was that obviously intended by the trial court; that is, that the jury, in order to convict the defendant of murder, had to find proven both that the defendant intended to cause the victim's death and that his conduct was, in fact, the proximate cause of her death.[5]

---

[5] The last two sentences of the disputed charge were not necessary to the factual situation presented in this case because the cause of death was not in issue. Those sentences in the model charge correctly state that in order for a defendant to be found guilty of murder, the specific manner of death need not be that intended or anticipated as long as the victim's death was intended by the defendant and the defendant's conduct was the proximate cause of death. That instruction would be applicable, for example, where an accused with the intent to cause death by shooting, shoots the victim, who, as a result, falls from a rooftop and is killed by the fall rather than the bullet. That would be a particular kind of harm not intended by the accused. It nevertheless would sustain a charge of murder if the accused intended to cause death and the fall was the direct result of the action taken to effectuate that intent. See *Manna* v. *State,* 440 N.E.2d 473, 475 (Ind. 1982); *State* v. *Williams,* 652 S.W.2d 102, 111–12 (Mo. 1983); 1 W. LaFave & A. Scott, Substantive Criminal Law § 3.12.

Moreover, the trial court gave instructions, both prior and subsequent to the instruction at issue, that properly informed the jury that it had to find proven that the defendant intended to cause the victim's death before it could convict him of murder. Of particular note is that, after the instruction concerning causation was given, the trial court charged the jury on the manslaughter crimes that were lesser included offenses of the charged crime of murder. In those instructions the court emphasized that the differentiating factor between murder and the lesser included homicides was the differing intents required for conviction, and that the intent required for murder was the intent to cause death.

We conclude that the instruction of the trial court, on which the defendant focuses in isolation, did not, in the context of the entire charge, deprive him of his constitutional due process right to a fair trial nor did it result in an injustice. See *State* v. *Palmer,* 206 Conn. 40, 46, 536 A.2d 936 (1988); *State* v. *McDonough,* 205 Conn. 352, 356, 533 A.2d 857 (1987), cert. denied, 485 U.S. 906, 108 S. Ct. 1079, 99 L. Ed. 2d 238 (1988); *State* v. *Silano,* 204 Conn. 769, 773, 529 A.2d 1283 (1987). Because there was no constitutional violation, the defendant does not have a valid claim for relief under *Golding.* Further, because there was no manifest injustice, the defendant's claim does not warrant plain error review.[6] *State* v. *Wright,* 207 Conn. 276, 288–89, 542 A.2d 299 (1988).

## II

The defendant next claims that the trial court improperly excluded statements of a third party indicative of

---

[6] Plain error review "is reserved for truly extraordinary situations where the existence of error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." *State* v. *Hinckley,* 198 Conn. 77, 87–88, 502 A.2d 388 (1985).

the third party's culpability for the victim's death. He argues that the court's ruling deprived him of the right to present a defense and to a fair trial in violation of the sixth and fourteenth amendments to the United States constitution and article first, § 8 of the Connecticut constitution. He contends that the error was harmful and merits reversal of the trial court's judgment and a new trial. We disagree.

This claim of the defendant requires some factual background. A witness, Myrna Cedeno, testified that early one morning, approximately four days before the victim's body was found, she had seen Elan Howard and the victim engaged in an argument and a physical altercation. She also told the jury that later that same morning she had seen an exchange of money between Howard and a light-skinned black man, who was the tallest of a group of four black men standing in front of the Long Hill Road recreational center. She claimed she had then seen the tall man pull the victim into some bushes behind the recreational center. Cedeno further testified that approximately fifteen minutes to one-half hour thereafter the man emerged alone from the bushes. She claimed that, at that time, she had observed bloody scratches on his face and chest and had also been able to overhear an exclamation that he made to his companions. The state objected to the admission into evidence of anything that Cedeno had overheard.

The trial court held a hearing outside the presence of the jury wherein Cedeno testified that when the man came out of the bushes, he exclaimed: "I never have this—I never have Puerto Ricans. She was so delicious but this fucking bitch that scratch me all over." The testimony was ruled inadmissible by the trial court even though Cedeno was allowed by the court to testify to what she had observed. The basis on which the trial court excluded Cedeno's testimony is difficult to discern. At one point, however, the court said that it was

excluding her testimony as to what she had heard because it would tend to "clutter and confuse" the jury.

The state concedes that the trial court's ruling was incorrect, and that once Cedeno was allowed to testify as to what she had seen, she should also have been allowed to relate what she had heard. We agree. There are several reasons why the tall man's exclamation, as he emerged scratched and bleeding from the bushes, was admissible. The most obvious reason, however, is that what was said was a contemporaneous spontaneous utterance, admissible as an exception to the hearsay rule. See *State* v. *Stange,* 212 Conn. 612, 615, 563 A.2d 681 (1989); *Rockhill* v. *White Line Bus Co.,* 109 Conn. 706, 709, 145 A. 504 (1929); C. Tait & J. LaPlante, Connecticut Evidence (2d Ed.) § 11.11; B. Holden & J. Daly, Connecticut Evidence § 97c. "The ultimate question is whether the utterance was spontaneous and unreflective and made under such circumstances as to indicate absence of opportunity for contrivance and misrepresentation." *Cascella* v. *Jay James Camera Shop, Inc.,* 147 Conn. 337, 342, 160 A.2d 899 (1960). The exclamation excluded by the trial court fit that description.

Although the state on appeal concedes that the trial court's ruling was incorrect, it argues that the bulk of the defendant's third party culpability theory of defense was before the jury. It claims, consequently, that the exclusion of Cedeno's testimony concerning what she had heard, detracted little from the impact of that defense, was harmless, and does not warrant reversal. We agree.

"Generally, the admissibility of evidence is a matter of state law and unless there is a resultant denial of fundamental fairness or the denial of a specific constitutional right, no constitutional issue is involved. . . ." (Internal quotation marks omitted.) *State* v. *Flanders,*

214 Conn. 493, 500–501, 572 A.2d 983, cert. denied, 498 U.S. 901, 111 S. Ct. 260, 112 L. Ed. 2d 217 (1990); *State* v. *Walker,* 215 Conn. 1, 5, 574 A.2d 188 (1990). Cedeno's testimony in front of the jury quite graphically presented evidence implicating the tall man in some type of physical encounter or altercation with the victim in the vicinity of the place where her body was later found and at a time when her death could possibly have occurred. Cedeno's testimony, concerning the man's statement, would have added little to the defense theory that the victim was killed by the tall man. The court's ruling, therefore, did not prevent the defendant from presenting that defense. Consequently, the exclusion of Cedeno's testimony as to what she had heard was not a due process violation nor did it significantly impair the defendant's right to present a defense. Because there was no constitutional violation, the burden of demonstrating the harmfulness of the trial court's ruling was on the defendant. *State* v. *Vitale,* 197 Conn. 396, 403, 497 A.2d 956 (1985); *State* v. *Briggs,* 179 Conn. 328, 333, 426 A.2d 298 (1979), cert. denied, 447 U.S. 912, 100 S. Ct. 3000, 64 L. Ed. 2d 862 (1980). We conclude that such a showing has not been made.

Cedeno testified before the jury that the tall man had pulled the victim into the bushes after an exchange of money and that, when he later emerged, he was scratched and bloodied and swearing at the victim but looking "satisfied [with] what he have." Moreover, Cedeno testified that she had been approached in a threatening manner by the tall man immediately after the incident, but that he had been persuaded by his companions not to harm her because she was from the neighborhood and would not talk. Also, there was evidence, independent of Cedeno's testimony, that the victim was a known prostitute and that her body was found in proximity to the site where she and the tall

black man had their encounter; that when the victim's body was found, it was naked except for a coat pulled over the head, that there were traces of blood under her fingernails and that there was semen in her vaginal vault. Furthermore, the defendant, in final argument, cited the evidence suggesting the culpability of the tall man and argued to the jury his theory that the victim had been assaulted, raped and killed by him. In view of the evidence that the defendant was able to bring to the attention of the jury concerning the possible culpability of the tall man, Cedeno's testimony as to what she had heard would have added little, if anything, to the theory of defense for which it was offered.

In addition, there was evidence, at trial, that would have made it extremely difficult for the jury to have accepted the theory of the tall man's culpability. Two eyewitnesses, Sherrie Washington and Elan Howard, both testified that they had seen the defendant inflict the fatal blows. Another witness, Marilyn Lopez, testified that she had heard arguments and screams emanating from 127 Harris Circle on a night in early May, 1989, at about 10:30 or 11 p.m. when, Washington testified, the defendant killed the victim. More importantly, the defendant, himself, gave a statement to the police that he had been present at 127 Harris Circle when the victim was killed and had seen Roger "Eli" Williams kill her with a hammer. In sum, we conclude that the exclusion of Cedeno's testimony concerning the exclamation of the tall man was harmless. It seems unlikely, in view of the defendant's own statement, that the jury would have accepted the defense theory that the victim had been killed by a third party at another time and place even if the tall man's exclamation had been allowed into evidence. See *State* v. *Flanders,* supra, 502.

## III

The defendant next claims that the trial court violated his right to present a defense because it excluded evidence of a confrontation between the victim and another third party, Larry Ricketts, and also excluded a complaint made by the victim to the Waterbury police concerning Ricketts.

At a hearing outside the presence of the jury, the defendant presented Detective Edward Stephens of the Waterbury police department as a witness. He questioned Stephens relative to a complaint that Stephens had received from the victim on April 7, 1989, approximately a month before her death. Stephens testified that, at that time, the victim alleged that she had previously been kidnapped and sexually assaulted by Ricketts in the basement of his house. The defendant, at the hearing, also offered Robert Jones as a witness. Jones testified that approximately one week before the victim's body had been found he had seen the victim and Ricketts arguing in front of 46 Harris Circle. Jones stated that Ricketts had had his hand raised and had had the victim "hemmed up in the corner and wouldn't let her out" until Jones intervened.

The trial court observed that it could find nothing in the testimony of Stephens and Jones that even "vaguely connect[ed]" Ricketts with the victim's death. The court, consequently, ruled that the evidence was irrelevant as to third party culpability and was inadmissible. We agree.

"Both this state and other jurisdictions have recognized that a defendant may introduce evidence which indicates that a third party, and not the defendant, committed the crime with which the defendant is charged. . . . The defendant, however, must show some evidence which directly connects a third party

to the crime with which the defendant is charged. . . . It is not enough to show that another had the motive to commit the crime . . . nor is it enough to raise a bare suspicion that some other person may have committed the crime of which the defendant is accused." (Citations omitted.) *State* v. *Echols,* 203 Conn. 385, 392, 524 A.2d 1143 (1987); *State* v. *Milner,* 206 Conn. 512, 517, 539 A.2d 80 (1988).

The admissibility of evidence of third party culpability is governed by the rules relating to relevancy. *State* v. *Echols,* supra, 393; *State* v. *Giguere,* 184 Conn. 400, 405–406, 439 A.2d 1040 (1981). "No precise and universal test of relevancy is furnished by the law, and the question must be determined in each case according to the teachings of reason and judicial experience." *Pope Foundation, Inc.* v. *New York, N.H. & H. R. Co.,* 106 Conn. 423, 435–36, 138 A. 444 (1927); *State* v. *Towles,* 155 Conn. 516, 523, 235 A.2d 639 (1967). The trial court has wide discretion in its rulings on evidence and its rulings will be reversed only if the court has abused its discretion or an injustice appears to have been done. *State* v. *Echols,* supra.

The flaw in the defendant's claim is that none of the proffered evidence directly connected Ricketts with the commission of the crime. While the evidence adduced outside the presence of the jury indicated animosity between Ricketts and the victim, and that Ricketts might possibly have had a reason to harm the victim, it went no further. It would be sheer speculation to draw from the evidence presented an inference that Ricketts had killed the victim. "Ordinarily, evidence concerning a third party's involvement is not admissible until there is some evidence which directly connects that third party with the crime." *State* v. *Kinsey,* 173 Conn. 344, 347–48, 377 A.2d 1095 (1977). Unless that direct connection exists it is within "the sound discretion of the trial court to refuse to admit such evidence

when it simply affords a possible ground of possible suspicion against another person." (Internal quotation marks omitted.) *State* v. *Payne,* 219 Conn. 93, 117, 591 A.2d 1246 (1991). Evidence of a possible motive is insufficient to establish relevancy. *State* v. *John,* 210 Conn. 652, 670–71, 557 A.2d 93, cert. denied, 493 U.S. 824, 110 S. Ct. 84, 107 L. Ed. 2d 50 (1989); *State* v. *Marshall,* 166 Conn. 593, 601, 353 A.2d 756 (1974). Moreover, "[t]he trial court's ruling on the relevancy of third party inculpatory evidence will be reversed on appeal only if the court has abused its discretion or an injustice appears to have been done." *State* v. *Payne,* supra; *State* v. *Delossantos,* 211 Conn. 258, 271, 559 A.2d 164, cert. denied, 493 U.S. 866, 110 S. Ct. 188, 107 L. Ed. 2d 142 (1989). After a review of the record, we conclude that the court did not abuse its discretion in finding the proffered evidence unconnected with the victim's death, and in ruling as it did.

In view of our analysis of the defendant's claim, we necessarily conclude that the defendant was not deprived of his constitutional right to present a defense. See *State* v. *Kelly,* 208 Conn. 365, 376, 545 A.2d 1048 (1988). Relevancy is an evidentiary question and "[e]very evidentiary ruling which denies a defendant a line of inquiry to which he thinks he is entitled is not constitutional error." *State* v. *Vitale,* 197 Conn. 396, 403, 497 A.2d 956 (1985). The defendant has placed a constitutional label on a nonconstitutional claim. *State* v. *Gooch,* 186 Conn. 17, 18, 438 A.2d 867 (1982). "The defendant's rights to confront and cross-examine witnesses and to present a defense do not give him the right to have admitted any evidence he chooses." *State* v. *Negron,* 221 Conn. 315, 328, 603 A.2d 1138 (1992). In the exercise of his rights, the defendant, as well as the state, must comply with the established rules of evidence and procedure. Id.; *State* v. *Kemp,* 199 Conn. 473, 479, 507 A.2d 1387 (1986). We find no merit in this claim of the defendant.

## IV

Finally, the defendant claims that the trial court committed plain error by not delivering, sua sponte, an accomplice charge regarding the testimony of Elan Howard. He argues that he is entitled to plain error review of his claim despite his failure to preserve it at trial.[7] See Practice Book § 4185. We are not persuaded.

It is well established that it is the duty of the trial court to instruct the jury to scrutinize carefully the testimony of an accomplice of the defendant when the evidence so warrants. *State* v. *Brown,* 187 Conn. 602, 612, 447 A.2d 734 (1982); *State* v. *Ferrara,* 176 Conn. 508, 511, 408 A.2d 265 (1979). It is also well established that plain error "review is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *State* v. *Wright,* 207 Conn. 276, 288–89, 542 A.2d 299 (1988); *State* v. *Miller,* 202 Conn. 463, 469, 522 A.2d 249 (1987).

We conclude that the evidence adduced at trial did not so clearly require an accomplice instruction that it was plain error for the trial court not to deliver such an instruction sua sponte. Review of the record discloses that there was evidence that Howard was present at the scene when the defendant killed the victim. There was also evidence that he assisted the defendant in disposing of the victim's body after she was killed. There had been, however, testimony by Howard that he had acted only under duress and had not willingly aided the defendant. Moreover, the defendant's own statement to the police did not ascribe any role in the victim's slaying to Howard.

---

[7] Because the failure to give an accomplice instruction is not constitutional error, the defendant does not request review under *Evans* and *Golding. State* v. *Brown,* 187 Conn. 602, 613, 447 A.2d 734 (1982).

In order for one to be an accomplice there must be mutuality of intent and community of unlawful purpose. *State* v. *McCalpine,* 190 Conn. 822, 832, 463 A.2d 545 (1983); *State* v. *Teart,* 170 Conn. 332, 336, 365 A.2d 1200 (1976); *State* v. *Polanco,* 26 Conn. App. 33, 43, 597 A.2d 830, cert. denied, 220 Conn. 926, 598 A.2d 367 (1991). The trial court, in this instance, might reasonably have concluded that the evidence of Howard's role in the victim's death did not indicate mutuality of intent and community of unlawful purpose or that the evidence thereof was so insufficient, inconclusive or ambivalent that an accomplice instruction was not appropriate. Since such an instruction was not requested, the defendant's trial counsel seems to have been in accord. In any event, we conclude that under the circumstances, the omission of an accomplice instruction in the court's charge to the jury, if misguided, was not so obvious or egregious that it merits plain error review.

The judgment is affirmed.

In this opinion PETERS C. J., GLASS and BORDEN, Js., concurred.

BERDON, J., dissenting. I disagree with the result reached in part II of the majority opinion. The trial court allowed the witness, Myrna Cedeno, to testify to the following, which she observed during the time frame in which the victim's death could have occurred: that a tall black man pulled the victim into the bushes in the approximate vicinity of where she was found dead and that he emerged alone fifteen to thirty minutes later with bloody scratches on his face and chest. The trial court refused, however, to allow Cedeno to testify as to what the tall black man said as he emerged from the bushes.

The majority concedes that the man's statement was admissible under the spontaneous utterance exception

to the hearsay rule and possibly under other hearsay exceptions. It nevertheless concludes that the exclusion of what the tall black man said was not harmful because "the bulk of the defendant's third party culpability theory of defense was before the jury" as a result of Cedeno's testimony about what she saw.

This is just not the case. Cedeno would have testified that the tall black man exclaimed: "I never have this—I never have Puerto Ricans. She was so delicious but this fucking bitch that scratch me all over." With just Cedeno's testimony about her observation of what the tall black man did, the jury had to infer that he had had violent sex with the victim, which could have led to her death. The excluded evidence of what the man said and the tenor of the language he used, if believed, would have *directly* proven that the man had had violent sex with the victim, thereby rendering it more likely that he—and not the defendant—had caused her death. Moreover, the man's statement could have carried great weight with the jury because of its spontaneity.[1]

"Under our state and federal constitutions, [t]he right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations. The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process. *State* v. *Mastropetre,* 175 Conn. 512, 520, 400 A.2d 276 (1978), quoting *Chambers* v. *Mississippi,* 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973); *State* v. *Fernandez,* 198 Conn. 1, 15, 501 A.2d 1195 (1985). The denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice. In order to declare a denial

---

[1] The spontaneous utterance is a firmly rooted exception to the hearsay rule which is at least two centuries old. *White* v. *Illinois,* 502 U.S   , 112 S. Ct. 736, 742 n.8, 116 L. Ed. 2d 848 (1992).

of it we . . . must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial. *Lisenba* v. *People of State of California,* 314 U.S. 219, 236, 62 S. Ct. 280, 86 L. Ed. 166 [1941], rehearing denied, 315 U.S. 826, 62 S. Ct. 620, 86 L. Ed. 1222 [1942]. *State* v. *Griffin,* 175 Conn. 155, 160, 397 A.2d 89 (1978). *State* v. *Binet,* 192 Conn. 618, 634, 473 A.2d 1200 (1984)." (Internal quotation marks omitted.) *State* v. *Torres,* 210 Conn. 631, 644–45, 556 A.2d 1013 (1989).

By denying the defendant the opportunity to present this evidence to the jury, the trial court tore the heart out of the defendant's third party culpability defense. I agree with the defendant that "[e]xclusion of the third party's statement prevented the jury from hearing the evidence which would turn an ambiguous event into a meaningful defense . . . ." Accordingly, I believe that the exclusion of this relevant exculpatory evidence, which was essential to the defendant's third party culpability defense, compromised the fundamental fairness of his trial, and was error of constitutional magnitude. See *State* v. *Flanders,* 214 Conn 493, 501, 572 A.2d 983, cert. denied, 498 U.S. 901, 111 S. Ct. 260, 112 L. Ed. 2d 217 (1990).

Therefore, the defendant must be granted a new trial unless the state proved that the error was harmless beyond a reasonable doubt. *Rose* v. *Clark,* 478 U.S. 570, 576, 106 S. Ct. 3101, 92 L. Ed. 2d 460 (1986); *State* v. *Cerilli,* 222 Conn. 556, 584, 610 A.2d 1130 (1992). The state has not met its burden.[2] Admission of the tall black man's statement could have nailed down, in a very

---

[2] Even if the court's error was characterized as not of constitutional dimension, the defendant has proved that the erroneous exclusion of the tall black man's statement probably affected the outcome of the trial. See *State* v. *Tatum,* 219 Conn. 721, 738, 595 A.2d 322 (1991) (for errors that do not reach a constitutional level, "the burden rests upon the defendant to demonstrate the harmfulness of the court's ruling").

graphic and persuasive manner, that he had violently sexually assaulted the victim at the approximate location where her body was found within the time frame of when her death occurred. It is quite possible that the defendant would have been acquitted on the basis of this statement, taken together with Cedeno's other testimony about the actions of the tall black man and evidence that the victim's body was found nude, except for a coat over her head, with blood and inch-long arm hair under her fingernails and with semen in her vagina in the approximate location where the incident occurred with the black man.

The majority claims that the testimony of two eyewitnesses "would have made it extremely difficult for the jury to have accepted the theory of the tall man's culpability." On the contrary, this evidence was far from convincing. The first eyewitness, Sherrie Washington, was a drug addict with a $300 a day crack addiction, who did not discuss the incident with the police until nine months after the victim's death. The second eyewitness, Elan Howard, was on probation for a drug offense. Howard first talked to the police, approximately one month after the victim's body was found, when he was arrested for possession of narcotics, escape from custody and also hindering prosecution in connection with this case. He had refused to tell the police anything until the court set a $50,000 bond on the hindering charge. The morning after the bond was set, Howard changed his mind and gave a statement inculpating the defendant. Thereafter, the state nolled the charges against him.[3]

At trial, after Howard had identified the defendant as the victim's assailant, the following colloquy occurred:

---

[3] It is unclear from the record whether all the charges were nolled or just the hindering prosecution charge.

"[Assistant State's Attorney Robert Brunetti]: Is there any doubt in your mind that this is the black male that struck the girl inside 127 Harris Circle?

"[Howard]: Somewhat. Because I mean I couldn't say it was exactly him but—

"[Brunetti]: You just identified him.

"[Howard]: I know I identified him because he looks familiar, but there was nothing in his face—yes, it was him."

Such testimony hardly supports the majority's view that the evidence against the defendant was airtight or unassailable. The admission of the erroneously excluded statement might well have caused the jury to disregard the testimony of these two state's witnesses and to return a verdict of not guilty.

Although the defendant may not have been the most credible witness, nor was he a pillar of society, he still had a fundamental right to a fair trial. This includes the right to present relevant and competent evidence to support his defense. When, as in this case, evidence could directly establish the culpability of another, its exclusion violates the accused's constitutional right to due process of law.

Accordingly, I would reverse and order a new trial.