BRUCE BOLES *v.* COMMISSIONER OF CORRECTION
(AC 24369)

Lavery, C. J., and McLachlan and Gruendel, Js.

Argued February 16—officially released June 14, 2005

*David B. Rozwaski,* special public defender, for the appellant (petitioner).

*Mitchell S. Brody,* senior assistant state's attorney, with whom, on the brief, were *John A. Connelly,* state's attorney, and *Robin A. Lipsky,* senior assistant state's attorney, for the appellee (respondent).

*Opinion*

LAVERY, C. J. The petitioner, Bruce Boles, appeals following the denial by the habeas court of his petition for certification to appeal from the dismissal of his petition for a writ of habeas corpus. On appeal, the petitioner claims that the court abused its discretion in denying his petition for certification to appeal and that the court improperly rejected his claim of actual innocence. We dismiss the petitioner's appeal.

The petitioner was convicted by a jury of the crime of murder in violation of General Statutes § 53a-54a (a) for the bludgeoning death of a woman in May, 1989. The petitioner appealed from his conviction, which our Supreme Court affirmed in *State* v. *Boles,* 223 Conn. 535, 613 A.2d 770 (1992). Subsequently, the petitioner filed a two count petition for a writ of habeas corpus, asserting claims of actual innocence and prosecutorial misconduct.[1] The habeas court found that the petitioner had failed to establish his actual innocence and dis-

---

[1] The petitioner has pursued only his actual innocence claim on appeal.

missed the petition. It also denied the petitioner certification to appeal from the judgment of dismissal.

Our Supreme Court stated that the jury reasonably could have found the following facts. "[A] witness, Sherrie Washington, [testified] that, on an evening in early May, 1989, at approximately 10:30 p.m., Washington, Elan Howard, the victim, the [petitioner], and others were in the hallway of a building in a housing project at 127 Harris Circle in Waterbury. The victim had gone to the building to buy drugs. While there, she encountered the [petitioner], who claimed that the victim was indebted to him and confiscated her drug money. In response, the victim screamed at the [petitioner] that she was 'dope sick' and needed the drugs. At this point, Howard asked the [petitioner] if the [petitioner] wished him to attempt to quiet the victim down. The [petitioner], in response, said 'No,' that he could 'handle it,' and that she was 'really going to be quiet now.' The [petitioner] then obtained a small crowbar from a utility closet. With the crowbar, he struck the victim on the left side of the head, causing her to fall back against Howard. He then struck the victim two more blows, the last while she was lying on the floor. Thereafter, frightened, Washington ran from the building. From a position outside 127 Harris Circle, however, she saw the [petitioner] and another man, whom she believed to be Howard, carry the victim's body out of the building and place it in the trunk of an automobile and drive away. The next day the [petitioner] threatened to kill Washington if she disclosed what she had seen the previous night.

"Howard testified that he had been present in the hallway at 127 Harris Circle on the night the victim had been killed and that he had seen the [petitioner] inflict the fatal blows. Howard also acknowledged that he had assisted the [petitioner] in carrying the victim's body out of the building and placing it in the trunk of a car.

He said he had done so, however, only after having been threatened with death by the [petitioner] if he refused. He also stated that he had been again threatened as he was about to leave after placing the body in the trunk. He then went with the [petitioner] and assisted in removing the body from the automobile, but as soon as the opportunity presented itself he dropped the body and ran.

"Further, a statement given by the [petitioner] to Detective Sergeant Joseph Morgan of the Waterbury police department on February 27, 1990, was read to the jury. In his statement the [petitioner] told Morgan that he had been present at 127 Harris Circle the night the victim had been killed and had witnessed the fatal assault. He said, however, that another man had committed it. He then described, and identified from a photographic array, Roger 'Eli' Williams as the person who had assaulted and killed the victim with what the [petitioner] said were blows to the head with a hammer.

"The state, however, produced as a witness Berone Richardson, an employee of the department of [correction]. Richardson testified that Williams had been in the custody of the department of correction at the time in question and had, in fact, been continuously confined from December 28, 1988, until the time of trial." *State* v. *Boles*, supra, 223 Conn. 538–39. Further facts will be provided as needed.

"Faced with a habeas court's denial of a petition for certification to appeal, a petitioner can obtain appellate review of the dismissal of his petition for habeas corpus only by satisfying the two-pronged test enunciated by our Supreme Court in *Simms* v. *Warden*, 229 Conn. 178, 640 A.2d 601 (1994), and adopted in *Simms* v. *Warden*, 230 Conn. 608, 612, 646 A.2d 126 (1994). First, he must demonstrate that the denial of his petition for certification constituted an abuse of discretion. . . .

Second, if the petitioner can show an abuse of discretion, he must then prove that the decision of the habeas court should be reversed on its merits. . . .

"To prove an abuse of discretion, the petitioner must demonstrate that the [resolution of the underlying claim involves issues that] are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further." (Internal quotation marks omitted.) *Anderson* v. *Commissioner of Correction*, 83 Conn. App. 595, 597, 850 A.2d 1063, cert. denied, 271 Conn. 905, 859 A.2d 560 (2004).

The petitioner claims that the court abused its discretion both in denying certification to appeal and in dismissing his petition for a writ of habeas corpus because he actually was innocent of the murder. "[A] substantial claim of actual innocence is cognizable by way of a petition for a writ of habeas corpus, even in the absence of proof by the petitioner of an antecedent constitutional violation that affected the result of his criminal trial. . . . To prevail on a claim of actual innocence, the petitioner must satisfy two criteria. First, [he] must establish by clear and convincing evidence that, taking into account all of the evidence—both the evidence adduced at the original criminal trial and the evidence adduced at the habeas corpus trial—he is actually innocent of the crime of which he stands convicted. Second, [he] must also establish that, after considering all of that evidence and the inferences drawn therefrom as the habeas court did, no reasonable fact finder would find the petitioner guilty of the crime." (Citation omitted; internal quotation marks omitted.) *Player* v. *Commissioner of Correction*, 73 Conn. App. 556, 559, 808 A.2d 1140, cert. denied, 262 Conn. 926, 814 A.2d 378 (2002).

The petitioner's claim of actual innocence is based on evidence he alleges demonstrates that (1) he was

incarcerated at the time the victim was murdered and (2) there was potential third party culpability, and that exculpatory evidence improperly was destroyed and never subjected to DNA testing. After reviewing the record, we agree with the court's conclusion that the petitioner did not meet his burden of establishing his innocence.

The majority of the petitioner's argument rests on his allegation that he was incarcerated in April, 1989, when, he contends, the victim was murdered. In support of his contention, he relies on the court's finding that he was incarcerated in April, 1989, and the age of the fetus of the pregnant victim. We conclude that this evidence does not establish clearly and convincingly the petitioner's innocence.

At trial, Harold Wayne Carver, the state's chief medical examiner, testified at trial that the victim was pregnant and that her fetus was seventeen to eighteen weeks old at the time of her death. Charles Esposito, an emergency room physician, testified at the habeas trial that he examined the victim on April 7, 1989, and that on the basis of his examination of her uterus and the information she reported, he believed that the victim was fourteen to sixteen weeks pregnant. Esposito did not perform any other tests that would have pinpointed more precisely and accurately the age of the fetus. The petitioner argues that this evidence shows that the victim was killed in April, 1989, when he was incarcerated, which proves his innocence. We disagree.

The court made the following relevant findings in regard to that evidence. "We heard testimony from Dr. Esposito, and we have exhibits also in the form of the trial transcript, as well as . . . the autopsy report and other exhibits, which were presented at trial. The court listened to Dr. Esposito's testimony and finds it compelling, but not convincing on any of the issues that would

be germane to this proceeding. He testified that his investigation was made based upon a conversation with the victim, whose reliability as a historian is questionable. He also did not perform any tests or any other procedures to determine the actual date of the pregnancy or the term of the pregnancy at that point. And I think he was quite candid in indicating that he could not be more precise. So, that particular testimony, although believable, does not demonstrate actual innocence in this case."

We agree with the court. The age of the victim's fetus was not irrefutable evidence of the petitioner's innocence. On the basis of the information provided in the physicians' testimony, the victim could have been killed anywhere between roughly April 14 and May 5, 1989. The petitioner was incarcerated from April 6 to April 14, 1989, and from April 19 to May 2, 1989. The petitioner was not incarcerated at all times within the period in which the victim could have been killed. In fact, eyewitness testimony indicated that the murder occurred in the beginning of May, 1989, and the petitioner's statement to the police placed him at the scene of the crime. That evidence correlates with the time frame given by the physicians, the petitioner's release from prison and the medical testimony that the victim had been dead from four days to two weeks before her body was discovered on May 19, 1989. Therefore, we cannot conclude that this evidence exonerated the petitioner.

The petitioner also argues that additional exculpatory evidence of third party culpability was not admitted, and that physical evidence improperly was destroyed or deteriorated and was never subjected to DNA testing. We conclude that we need not address that issue because any impropriety was harmless.

In the petitioner's direct appeal, our Supreme Court addressed the issue of third party culpability evidence.

Discussing the exclusion of an exclamation by a tall man, it explained that "there was evidence, at trial, that would have made it extremely difficult for the jury to have accepted the theory of [a third party's] culpability. Two eyewitnesses, Sherrie Washington and Elan Howard, both testified that they had seen the [petitioner] inflict the fatal blows. Another witness, Marilyn Lopez, testified that she had heard arguments and screams emanating from 127 Harris Circle on a night in early May, 1989, at about 10:30 or 11 p.m. when, Washington testified, the [petitioner] killed the victim. More importantly, the [petitioner], himself, gave a statement to the police that he had been present at 127 Harris Circle when the victim was killed and had seen Roger 'Eli' Williams kill her with a hammer. In sum, we conclude that the exclusion of [third party culpability evidence] was harmless. It seems unlikely, in view of the [petitioner's] own statement, that the jury would have accepted the defense theory that the victim had been killed by a third party at another time and place even [if more testimony] had been allowed into evidence." *State* v. *Boles*, supra, 223 Conn. 547. We believe that this logic applies to any other potential exculpatory evidence. In contrast to the evidence establishing his guilt, the evidence presented by the petitioner does not establish third party culpability, and we note that unpreserved, untested evidence is not presumed to be exculpatory. See *Correia* v. *Rowland*, 263 Conn. 453, 474, 820 A.2d 1009 (2003).

The petitioner maintains that the additional eyewitness testimony that was used to establish his guilt was not credible and should not have been taken into consideration. He argues that the witnesses' testimony was suspect and contained numerous inconsistencies. It is not this court's place to make credibility determinations. "[I]t is without question that the [fact finder] is the ultimate arbiter of fact and credibility. . . . As such,

it may believe or disbelieve all or any portion of the testimony offered. . . . It is also the absolute right and responsibility of the [fact finder] to weigh conflicting evidence . . . ." (Citation omitted; internal quotation marks omitted.) *Stuart* v. *Stuttig*, 63 Conn. App. 222, 226, 772 A.2d 778 (2001). We find no reason to disturb the credibility determinations as found by the jury and accepted by the habeas court.

The petitioner also takes issue with the use of his written statement to the police as evidence of his guilt. He contends that he consistently has testified that he did not make those statements to the police and that he felt coerced to sign the statement. At the habeas trial, the petitioner submitted the testimony of an expert, professor Christian A. Meissner of Florida International University, for his opinion that there were certain indicators that demonstrated that the petitioner *may* have been subjected to "minimization," a coercive police tactic in which the police minimize the potential consequences in order to gain a confession and, therefore, that the petitioner's statement could be lacking in veracity.

The court made the following statement regarding Meissner's testimony. "[T]he court does not find the academic testimony concerning what has been referred to as a confession, but which is really a statement given and signed, admittedly signed, by the petitioner to the police department as at all persuasive or compelling. The court can almost take judicial notice that at some time and in some place and under some circumstances, every confession may not be accurate. But that does not lend any support to the petitioner's claims in this particular proceeding." Given the court's findings, police testimony at the criminal trial that the statement was not coerced and Meissner's acknowledgment that he had not spoken with the police interrogators, we agree with the court that the petitioner has not made

a compelling or persuasive argument that his statement was coerced.

As found by the court after its review of the evidence and transcript, the petitioner failed to prove that he is actually innocent of murder or that no reasonable fact finder would find him guilty of the crime. We agree. Given the evidence against the petitioner in his criminal trial, he did not sustain his burden of proof as to his claim of actual innocence. Thus, the court did not abuse its discretion in denying the petitioner certification to appeal from the dismissal of his petition for a writ of habeas corpus.

The appeal is dismissed.

In this opinion the other judges concurred.