## STATE OF CONNECTICUT *v.* ELISEO RIVERA
## (14991)

Heiman, Schaller and Stoughton, Js.

Argued October 24, 1995—decision released February 13, 1996

*Bruce A. Sturman,* public defender, for the appellant (defendant).

*Kevin T. Kane,* state's attorney, with whom, on the brief, was *Keith Currier,* legal intern, for the appellee (state).

HEIMAN, J. The defendant appeals[1] from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a. The defendant claims that the trial court improperly excluded testimony of the victim's mother relating to the victim's statement to her ten days prior to his death concerning his fear of his demise. We affirm the judgment of the trial court.

---

[1] This appeal was taken originally to the Supreme Court. Pursuant to Practice Book § 4023, the Supreme Court transferred the appeal to this court.

The jury could reasonably have found the following facts. On the morning of December 31, 1993, Shawn Suarez went to 40 Crystal Avenue, a high rise apartment building in New London, to visit Miguel Morales, whose girlfriend resided on the sixth floor of the building, also known as building C. Suarez was accompanied by Edwin Conception. They arrived at building C and found Miguel Morales in his girlfriend's apartment with Miguel's brother, Benjamin, and some others. Later in the morning, the defendant arrived. The defendant had his girlfriend's young son with him.

The group sat around the apartment, watching television and talking. Later in the morning, Suarez, Conception, Miguel Morales and the defendant left the apartment and went down to the first floor of building C. The four men went outside onto the plaza. The defendant walked off by himself. None of the men saw in which direction he went. The other three men decided to return to the apartment.

As the three men entered the building, Suarez saw Richard Morales[2] standing in the lobby of building C. Suarez knew Richard Morales because they had grown up together. Suarez stopped to talk with Richard Morales while Conception and Miguel Morales went down the hallway to the elevator to return upstairs. When Suarez stopped to talk with Richard Morales, no one else was in the lobby.

As Suarez and Richard Morales stood talking, the defendant entered the lobby from the hallway and stood against a pillar in the lobby area. The defendant and Richard Morales did not speak to each other. Richard Morales' back was turned toward a set of glass doors, and his right side was exposed to the defendant. The defendant was wearing a black jacket, black jeans and

---

[2] Richard Morales' last name is spelled "Moralis" in the trial transcript. We use the spelling that appears in the substitute information.

a black hood mask that covered parts of his forehead and nose, and had holes cut into the mask for the eyes. The mask was one that Suarez had loaned to the defendant a few days before December 31, 1993.

After he spoke with Richard Morales, Suarez started to walk toward the elevator. No one else was in the lobby other than the defendant and Richard Morales, and no one was outside the doorway. As Suarez walked down the hallway toward the elevator, he heard a loud bang and began to run. Suarez ran upstairs to the apartment occupied by Miguel Morales' girlfriend.

Several minutes later, the defendant knocked and entered the apartment. The defendant had the nickname "Sick." The defendant said, "I'm sick, that's why they call me Sick." The defendant then said, "I busted that nigger" or "I bust him." The word bust, used in that context, means to shoot.

The defendant, Suarez, and Benjamin Morales then went to the lobby and observed a number of police officers as well as other persons in the lobby. The victim, whom the police identified as Richard Morales, was lying on the floor in front of the glass doors. The police were taking photographs of people in the lobby area.

Officer Christopher Miller responded to an emergency call regarding the shooting and, when he arrived at the scene, he found the victim lying on the floor in the southeast corner of the lobby. The victim was lying on his back with his head toward the wall and his feet toward the lobby. Miller observed that the victim had suffered a gunshot wound to the head. The victim was breathing and was bleeding from his forehead. Soon after Miller's arrival on the scene, ambulance personnel transported the victim to Lawrence and Memorial Hospital.

Later in the day, the defendant went to Suarez' house on Redden Avenue. The defendant and Suarez had a conversation in the parking lot and the defendant said to Suarez, "I ain't no joke." Suarez interpreted "I ain't no joke" to mean that the defendant was not a person to "mess with."

The next night, the defendant again went to Suarez' house. The defendant told Suarez several times that "he was no joke," and also said several times that he "ain't nothing to be messed with." He also said that he "got his propts," an expression that means he "got his respect." The defendant also asked Suarez: "Are the brothers mad at me for I had to do what I had to do?" Suarez asked the defendant if he felt bad about "busting" someone, and the defendant answered that "he wasn't thinking about that." The defendant and Suarez went into the bathroom and Suarez asked the defendant how he had killed the victim. The defendant answered, "I blasted that nigger."

The victim died on January 3, 1994, at Lawrence and Memorial Hospital. An autopsy established that the victim died as a result of a gunshot wound to the head with extensive injury to the brain. The bullet had entered the back of the head in the occipital region on the right side. A forensic examination of the distribution of numerous particles of gun powder residue on the back of the victim's sweatshirt indicated that the bullet that killed the victim was fired from a distance of one to two feet.

On January 5, 1994, detectives interviewed the defendant. He admitted that he was at 40 Crystal Avenue on the day of the shooting, and said that he was there visiting with Benjamin and Miguel Morales at their apartment. He said that Suarez and Conception were also at the apartment. He stated that at the time of the shooting, he was in the apartment and that someone in the apartment noticed a commotion in the parking

lot and that, subsequently, he went downstairs to see what was happening. He also told the police that, on the day of the shooting, he was wearing a green colored coat and a hat. The defendant denied any involvement in the killing of the victim. A few days after the shooting, the defendant was arrested.

Following a jury trial, the defendant was convicted of murder in violation of General Statutes § 53a-54a. On appeal, the defendant asserts as his only claim that the trial court improperly refused to permit the victim's mother to testify about statements that the victim made to his mother concerning his fear that something was going to happen to him because he owed a debt to his girlfriend's mother. We are unpersuaded.

Certain additional facts are necessary to an understanding of our resolution of this issue. Prior to resting his case-in-chief, the defendant made an offer of proof consisting of a statement made by Eugenia Morales, the mother of the victim, to the New London police on January 3, 1994. The defendant asserted that he had Eugenia Morales under subpoena, and that he was offering her statement as indicative of what she would testify to if called as a witness. According to the defendant's synopsis of her statement,[3] Eugenia Morales said that "she saw her son, [the victim], the Tuesday prior to Christmas[4] at her apartment. At that meeting [the victim] was crying and he told his mother that if anything happens to him that she, his mother, should tell her sister or her brother the following. That [his girlfriend's] mother told him he got somebody from New York who can do something about it. Eugenia Morales represents that [the victim] owed money presumably to [his girlfriend's] mother. She continued to explain that her son told her that [his girlfriend's] mother threatened to get

---

[3] The statement was not offered as an exhibit at trial. The content of the statement comes from the defendant's synopsis made during the offer of proof.

[4] The shooting took place on December 31, 1993.

him for the loss or theft of drugs or money. Eugenia Morales explained that [the victim] lived with [his girlfriend] from the last time he was released from jail until this night, approximately one month prior to his death. Eugenia Morales suspects [his girlfriend's] mother of involvement in [the victim's] death."

The trial court questioned the defendant regarding the relevance of the proffered testimony, and the defendant responded that it was admissible to show "at the least, the victim's mother suspected that somebody other than the defendant committed the crime." The defendant further asserted that the mother's testimony was admissible under the state of mind exception to the hearsay rule. The defendant also argued that the testimony has "a strong indicia of reliability" because the conversation at issue took place in the context of a mother-son relationship as opposed to a relationship between strangers. The defendant maintained that, therefore, the trial court should admit the evidence, "because it suggests to the jury that somebody other than the defendant committed the crime."[5]

The state objected to admission of the evidence, asserting that it was double hearsay and irrelevant. The state argued that, at best, the proffered testimony consisted of speculation that an unknown third party may have had a possible motive to kill the victim. After the state's argument, the trial court questioned the defendant in an effort to clarify the defendant's theory of admissibility of the proffered testimony. The defendant indicated that his principal claim for the admissibility of the testimony was the state of mind exception to the hearsay rule. The defendant also reiterated that the victim's statement to his mother "bears great indicia of reliability." The trial court sustained the objection

---

[5] The defendant appears to have invoked both the state of mind exception to the hearsay rule and the so-called residual exception to the hearsay rule.

interposed by the state, thereby declining to permit the victim's mother to testify about the alleged conversation.

The defendant claims that the trial court's ruling was improper, and that the trial court should have admitted the proffered testimony in accordance with either the state of mind exception to the hearsay rule or the residual exception to the hearsay rule. We do not agree.

"Our standard of review regarding challenges to a trial court's evidentiary rulings is that these rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice. . . . In reviewing claims that the trial court abused its discretion, great weight is given to the trial court's decision and every reasonable presumption is given in favor of its correctness. . . . We will reverse the trial court's ruling only if it could not reasonably conclude as it did. . . . *State* v. *Leonard*, 31 Conn. App. 178, 190, 623 A.2d 1052, cert. granted, 226 Conn. 912, 628 A.2d 985 (1993), appeal withdrawn January 7, 1994." (Internal quotation marks omitted.) *State* v. *Rogers*, 38 Conn. App. 777, 796, 664 A.2d 291 (1995).

We first address the defendant's assertion that the proffered testimony should have been admitted under the state of mind exception to the hearsay rule. " 'Hearsay is an out-of-court statement offered into evidence to establish the truth of the matters contained therein. *State* v. *Cruz*, 212 Conn. 351, 356, 562 A.2d 1071 (1989).' *State* v. *Rinaldi*, 220 Conn. 345, 359, 599 A.2d 1 (1991). As such, it is inadmissible." *State* v. *Duntz*, 223 Conn. 207, 232–33, 613 A.2d 224 (1992). "An out-of-court statement is not hearsay, however, if it is offered to illustrate circumstantially the declarant's then present state of mind, rather than to prove the truth of the matter asserted." *State* v. *Blades*, 225 Conn.

609, 632, 626 A.2d 273 (1993). Of course, such an out-of-court statement by a declarant would only be admissible "to show his state of mind *where his mental state is relevant.* . . ." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Duntz*, supra, 233.

"Whether the victim's state of mind is relevant depends, however, on the nature of the issues at trial. A defendant's articulated or implied theory of defense may make the victim's state of mind material to the determination of the defendant's guilt or innocence." *State* v. *Crafts*, 226 Conn. 237, 253, 627 A.2d 877 (1993). Furthermore, we note that although "a victim's fear of another individual is admissible when relevant to the issues at trial . . . such cases have generally involved the testimony of a witness' personal observations of the victim's fear of *the defendant.*" (Emphasis added.) *State* v. *Blades*, supra, 225 Conn. 633.

The defendant's primary theory of defense, as indicated by his own testimony, was that he was upstairs in building C visiting with friends at the time of the shooting. He did not raise a defense that implicated his or the victim's state of mind. Moreover, neither the defendant nor the state put the victim's state of mind into issue at trial. Therefore, the proffered testimony, offered to illustrate circumstantially the victim's then present state of mind, was not relevant. Cf. *State* v. *Crafts*, supra, 226 Conn. 254 (victim's state of mind relevant because defendant's assertion throughout trial was that he was not guilty of murder because "victim" still alive); *State* v. *Blades*, supra, 225 Conn. 635 (victim's state of mind relevant because defendant invoked defense of extreme emotional disturbance to charge of murder asserting that his conduct resulted from provocation by victim).

If the defendant had introduced evidence at trial that another individual possessed the motive and intent to

murder the victim, and the proffered testimony was offered to illustrate circumstantially the victim's fear of that individual, it still would not have been relevant. "Evidence is relevant only if it has some tendency to establish the existence of a material fact." (Internal quotation marks omitted.) *State* v. *Duntz*, supra, 223 Conn. 233. The victim's alleged statements would have been irrelevant because the jury could not have reasonably drawn an inference from those statements that some unnamed, unidentified person had such an antagonistic relationship with the victim so as to have had the motive and intent to kill him. Id. "[T]he jury could not have drawn such an inference solely from the statements of the victim without resorting to impermissible speculation." Id.

We next address the defendant's assertion that the proffered testimony was admissible under the residual exception to the hearsay rule. "An out of court statement is hearsay when it is offered to establish the truth of the matters contained therein. . . . As a general rule, hearsay evidence is not admissible unless it falls under one of several well established exceptions. . . . The purpose behind the hearsay rule is to effectuate the policy of requiring that testimony be given in open court, under oath, and subject to cross-examination. . . . The residual, or catch-all, exception to the hearsay rule allows a trial court to admit hearsay evidence not admissible under any of the established exceptions if: (1) there is a reasonable necessity for the admission of the statement, *and* (2) the statement is supported by the equivalent guarantees of reliability and trustworthiness essential to other evidence admitted under the traditional hearsay exceptions." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Oquendo*, 223 Conn. 635, 664, 613 A.2d 1300 (1992).

"The reliability of a witness' hearsay statement is essential because the opposing party does not have the

opportunity to cross-examine out-of-court declarants to test the truthfulness of their statements. *State* v. *Lawson*, 23 Conn. App. 358, 362, 580 A.2d 87 (1990)." *State* v. *Smith*, 35 Conn. App. 51, 59, 644 A.2d 923 (1994). There is no indication here that the victim's statement to his mother was sufficiently reliable and trustworthy to satisfy the residual exception to the hearsay rule. There is no special sanctity attached to a statement allegedly made by a son to a mother such as to vest it with the aura of reliability necessary to invoke the residual exception. Other than the assertion by counsel as to his opinion of the reliability of the statement, nothing was produced to establish the key point of reliability. Moreover, the proffered testimony did not contain information necessary to the resolution of the case. *State* v. *Dollinger*, 20 Conn. App. 530, 539, 568 A.2d 1058, cert. denied, 215 Conn. 805, 574 A.2d 220 (1990). The victim's fear that his girlfriend's mother had threatened to retain a nameless individual to "do something about it" and that his girlfriend's mother threatened to "get him" because of an ambiguous debt relating to drugs or money was not necessary to the determination of whether the defendant committed the crime with which he was charged. *State* v. *Erhardt*, 17 Conn. App. 359, 369, 553 A.2d 188 (1989).

We thus conclude that the trial court did not abuse its discretion in determining that the proffered evidence was not admissible under either the state of mind exception or the residual exception to the hearsay rule.

The judgment is affirmed.

In this opinion the other judges concurred.