STATE OF CONNECTICUT *v.* DARRELL TINSLEY
(AC 18368)

Lavery, C. J., and Schaller and Zarella, Js.

Argued March 27—officially released July 25, 2000

*Suzanne Zitser*, assistant public defender, for the appellant (defendant).

*John A. East III*, assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Rosita M. Creamer*, senior assistant state's attorney, for the appellee (state).

*Opinion*

LAVERY, C. J. The defendant, Darrell Tinsley, appeals from the judgment of conviction, rendered after a jury trial, of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (1) and risk of injury to a child in violation of General Statutes (Rev. to 1995) § 53-21, as amended by Public Acts 1995, No. 95-142,

§ 1. On appeal, the defendant claims that the trial court improperly (1) excluded evidence concerning the motive of the victim's mother to implicate him in the victim's death, (2) failed to instruct the jury not to discuss the case at the end of the first day of trial, which violated his constitutional right to a fair and impartial jury, and (3) improperly instructed the jury as to reasonable doubt. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. Georgia Graham, the victim's mother, and the defendant met at an office building in downtown Hartford, where they worked as security personnel. Although the defendant and Graham had an unstable relationship, they cohabited in a one bedroom apartment along with the victim, Daquan Roberts, Graham's fifteen month old son. During the course of the adults' relationship, individuals who knew the victim noticed a marked change in his behavior when he was in the presence of the defendant. At such times, the victim was timid, withdrawn and afraid of the defendant. The defendant's attitude toward the victim ranged from indifference to dislike. When Graham was no longer able to avail herself of professional child care, the defendant sometimes took care of the victim while Graham worked.

Prior to his death, the victim was in good health. On December 8, 1996, between 8 a.m. and 8:30 a.m., the defendant drove Graham to her place of employment. According to Graham, there was nothing wrong with the victim when she went to work. During the morning, Graham and the defendant spoke by telephone several times concerning the victim. At approximately 11:15 a.m., the defendant telephoned Graham, stating that there was something wrong with the victim and that he did not know what was the matter. The defendant then drove the victim to Graham's place of employment,

and from there all three proceeded to the Connecticut Children's Medical Center (medical center) in Hartford. They were involved in a motor vehicle accident en route.

When he arrived at the medical center, the victim was in critical condition because he was not breathing and had little heart activity. The victim died when resuscitation efforts failed. An autopsy revealed bruises on the victim's right cheek, left leg and chest, which an associate medical examiner from the office of the chief medical examiner determined occurred shortly before the victim's death. The injuries were inconsistent with an automobile accident, a twelve inch fall into a bathtub, cardiopulmonary resuscitation or bumping into a fire door, which were explanations offered by the defendant. The victim also suffered significant internal injuries, namely, multiple fresh cranial hemorrhages, a broken rib and a lacerated liver that caused three quarters of his blood to enter his abdominal cavity. According to the associate medical examiner, the victim's liver was lacerated by blunt trauma that occurred within an hour of death and was the cause of death.

After the victim died, the defendant was taken to the police station, where he gave a statement and repeatedly denied injuring the victim. The police inspected the apartment where the defendant and victim were alone prior to the victim's death. They found vomit and feces on the victim's clothes, a bedspread and the floor. The victim's blood was found on the bathroom door. When he was informed of the autopsy results, the defendant insisted that the doctors were wrong, a position he maintained throughout trial. The defendant was arrested on December 12, 1996, and the court, after a hearing in February, 1997, found probable cause. Subsequent to trial, the defendant appealed.

I

The defendant's first claim is that the court improperly excluded evidence concerning Graham's motive to implicate him in the victim's death. The defendant claims that the evidence was admissible under three exceptions to the hearsay rule, i.e., (a) present state of mind, (b) state of mind to prove future conduct and (3) the residual exception.[1] We do not agree.

[1] The defendant offered the testimony of Rosemarie Hill, a coworker of the defendant and Graham, to show that Graham had motive, bias or interest in falsely implicating him in the victim's death. The defendant sought to have Hill testify that Graham had told her of the defendant's infidelity and that Graham had warned him that "he would pay for it for the rest of his life." Because we conclude that Hill's proffered testimony was not admissible on the ground that it was double hearsay, as we discuss in this opinion, we need not address the defendant's specific claims. The proffered testimony was not admissible, however, under any of the hearsay exceptions offered by the defendant:

*Present state of mind:* "An out-of-court statement is not hearsay, however, if it is offered to illustrate circumstantially the declarant's then present state of mind, rather than to prove the truth of the matter asserted." *State* v. *Blades,* 225 Conn. 609, 632, 626 A.2d 273 (1993). The defendant wanted to use Graham's statement, allegedly made in January, 1997, to establish a motive on her part to implicate him in the victim's death. Hill's proffered testimony, however, was double hearsay and, thus, inadmissible.

*State of mind to prove future conduct:* "The hearsay statements of an *unavailable* declarant, made in good faith and not for a self-serving purpose, that express his or her present intentions to [do something] in the immediate future are admissible and allow the trier of fact reasonably to infer that the declarant's expressed intention was carried out." (Emphasis added.) *State* v. *Santangelo,* 205 Conn. 578, 592, 534 A.2d 1175 (1987). "Further, this court has acknowledged the Supreme Court's rule requiring the declarant to be unavailable. *State* v. *Jurgensen,* 42 Conn. App. 751, 757, 681 A.2d 981, cert. denied, 239 Conn. 931, 683 A.2d 398 (1996)." *Ormsby* v. *Frankel,* 54 Conn. App. 98, 108, 734 A.2d 575, cert. granted on other grounds, 250 Conn. 926, 738 A.2d 658 (1999). Here, Graham was available to testify, and the defendant had the opportunity to cross-examine her.

*Residual exception:* "It is well established that all hearsay exceptions are rooted in the notion that they contain a sufficient guarantee of trustworthiness to serve as a sufficient surrogate for cross-examination of testimony in court. *Chambers* v. *Mississippi,* [410 U.S. 284, 298–99, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973)]; *State* v. *Stange,* [212 Conn. 612, 625, 563 A.2d 681 (1989)]. The 'residual,' or 'catch-all,' exception to the hearsay rule allows a trial court to admit hearsay evidence not admissible under any of the estab-

The following additional facts are necessary for our resolution of this claim. Graham was called as a witness by the state and testified that the defendant had told her that he wondered what it would be like if the victim were not around anymore. During the defendant's case, counsel attempted to present evidence to demonstrate that Graham's testimony concerning the defendant's statement was a recent fabrication. Defense counsel theorized that Graham did not tell authorities of the defendant's statement about the victim at the time of his death because the statement was never made. Defense counsel intended to call Rosemarie Hill, a woman who worked with both Graham and the defendant, to offer testimony to support the defense theory.

Hill was called to testify in an offer of proof that she and Graham had a conversation in January, 1997, concerning the defendant's infidelity to Graham.[2] Graham was upset and reported to Hill "that she [Graham] told him [the defendant] if he ever messed around on her that he would pay for it for the rest of his life." The victim was never mentioned during the conversation between Hill and Graham. Defense counsel sought to have Hill's testimony admitted under one of the three exceptions to the hearsay rule for the purpose of impeaching Graham's credibility by showing that her testimony on direct examination was a recent fabrica-

---

lished exceptions if: (1) there is a reasonable necessity for the admission of the statement, and (2) the statement is supported by the equivalent guarantees of reliability and trustworthiness essential to other evidence admitted under the traditional hearsay exceptions. . . . We have stated that the necessity requirement is met when, unless the hearsay statement is admitted, the facts it contains may be lost, either because the declarant is dead or *otherwise unavailable,* or because the assertion is of such a nature that evidence of the same value cannot be obtained from the same or other sources. . . . *State* v. *Oquendo,* 223 Conn. 635, 664–65, 613 A.2d 1300 (1992)." (Emphasis in original; internal quotation marks omitted.) *State* v. *Lewis,* 245 Conn. 779, 805, 717 A.2d 1140 (1998). Here, again, Graham was available to testify.

[2] The defendant was incarcerated in January, 1997.

tion because she did not testify about the defendant's statement during the probable cause hearing in February, 1997.[3] According to defense counsel, Hill's testimony was to offered to show Graham's state of mind at the time of the victim's death, which caused her to fabricate the defendant's statement when she testified at trial. Following the offer of proof, the court sustained the state's objection to Hill's proffered testimony.

We review the court's preclusion of the proffered evidence by an abuse of discretion standard. *Ormsby* v. *Frankel*, 54 Conn. App. 98, 101, 734 A.2d 575, cert. granted on other grounds, 250 Conn. 926, 738 A.2d 658 (1999). "It is a fundamental rule of appellate procedure in the review of evidential rulings, whether resulting in the admission or exclusion of evidence, that an appellant has the burden of establishing that there has been an erroneous ruling which was probably harmful to him. *Casalo* v. *Claro*, 147 Conn. 625, 630, 165 A.2d 153 (1960); *State* v. *Kwaak*, 21 Conn. App. 138, 150–51, 572 A.2d 1015, cert. denied, 215 Conn. 811, 576 A.2d 540 (1990)." (Internal quotation marks omitted.) *State* v. *Suckley*, 26 Conn. App. 65, 73, 597 A.2d 1285, cert. denied, 221 Conn. 901, 600 A.2d 1028 (1991). The court's rulings "will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice." (Internal quo-

---

[3] During cross-examination at trial, defense counsel questioned Graham extensively as to why she did not report the defendant's statement to the authorities at the time of the victim's death. Graham testified that at the time of her child's death she was upset and did not think about or remember the defendant's words. In response to why she did not testify about the statement during the probable cause hearing, Graham testified that she answered only the specific questions that she was asked. She could not remember when she recalled the defendant's statement, but did so in response to the authorities' repeatedly asking her to think of any reason the defendant might have to harm the victim. Graham testified that given the shock of her baby's death, it took her some time to remember events and their sequence.

tation marks omitted.) *State* v. *Rivera*, 40 Conn. App. 318, 324, 671 A.2d 371 (1996).

"Because the admission of such evidence involves judicial discretion, [o]ur review is limited to whether [the] ruling exceeded the latitude accorded to the exercise of [such] discretion. *State* v. *Smith*, 198 Conn. 147, 158, 502 A.2d 874 (1985); *State* v. *Ibraimov*, 187 Conn. 348, 352, 446 A.2d 382 (1982)." (Internal quotation marks omitted.) *State* v. *Thomas*, 205 Conn. 279, 288, 533 A.2d 553 (1987). "We will reverse the trial court's ruling only if it could not reasonably conclude as it did." (Internal quotation marks omitted.) *State* v. *Rivera*, supra, 40 Conn. App. 324.

"Hearsay is an out-of-court statement offered into evidence to establish the truth of the matters contained therein. . . . *State* v. *Duntz*, 223 Conn. 207, 232, 613 A.2d 224 (1992). As a general rule, hearsay evidence is not admissible unless it falls under one of several well established exceptions. *State* v. *Oquendo*, 223 Conn. 635, 664, 613 A.2d 1300 (1992). If such evidence is offered to establish the truth of statements contained therein, the burden is on the proponent of the evidence, upon timely objection, to establish that the evidence is admissible." (Internal quotation marks omitted.) *New England Savings Bank* v. *Bedford Realty Corp.*, 238 Conn. 745, 753, 680 A.2d 301 (1996).

The defendant argues that he proffered Hill's testimony to demonstrate Graham's state of mind in January, 1997, with respect to her feelings about his infidelity to her and that the evidence therefore was not hearsay because it was not offered for the truth of the matter contained therein. We disagree. Hill's proffered testimony was not simple hearsay; it was double hearsay. Hill testified: "She said that *she told him* if he ever messed around on her that he would pay for it for the rest of his life." (Emphasis added.) The defendant

believes that Hill's testimony is reliable because she was a friend of both Graham and the defendant. Hill had known Graham for only four months at the time of their conversation. Such testimony does not carry the hallmark of reliability our rules of evidence require.

"The reason for the general rule which excludes hearsay evidence unless it comes within one of the recognized exceptions is basically that the sanction of an oath and the test of cross-examination are absent; and the exceptions to the rule have been fashioned where the statements are made under conditions judged to render them equal in reliability and trustworthiness to those which are made under the sanctions described." *State* v. *Barlow*, 177 Conn. 391, 396, 418 A.2d 46 (1979); see *State* v. *Hernandez*, 204 Conn. 377, 389–94, 528 A.2d 794 (1987); *State* v. *Gold*, 180 Conn. 619, 630–31, 431 A.2d 501, cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980).

" '[T]he risk of fabrication and distortion is significantly increased when a witness purports merely to repeat another's out-of-court declaration. It is always easier to say that X said something than to report personal observations of the event. Even if X did in fact tell the witness something, it would not be unusual for the person asserting to have overheard the out-of-court declaration to inject, intentionally or otherwise, additional or different statements into the conversation. Unfortunately, these fabricated or distorted statements will often be highly damaging admissions or confessions not easily discounted by the jury.' " *State* v. *Green*, 16 Conn. App. 390, 399, 547 A.2d 916, cert. denied, 210 Conn. 802, 553 A.2d 616 (1988).

The defendant also claims that the court's failure to admit Hill's testimony violated his sixth amendment right to present a defense. We do not agree.

"[E]very evidentiary ruling which denies a defendant a line of inquiry to which he thinks he is entitled is not constitutional error. . . . The defendant's rights to confront and cross-examine witnesses and to present a defense do not give him the right to have admitted any evidence he chooses. . . . In the exercise of his rights, the defendant, as well as the state, must comply with the established rules of evidence and procedure. . . . *State* v. *Boles*, 223 Conn. 535, 550, 613 A.2d 770 (1992). Excluding certain evidence does not vitiate the defendant's constitutional right to present a defense." (Internal quotation marks omitted.) *State* v. *Smith*, 35 Conn. App. 51, 57, 644 A.2d 923 (1994).

"[A hearsay challenge] is a claim of an erroneous evidentiary ruling and as such does not implicate the constitution. . . . *State* v. *Walsh*, 52 Conn. App. 708, 720, 728 A.2d 15, cert. denied, 249 Conn. 911, 733 A.2d 233 (1999)." *In re Brandon W.*, 56 Conn. App. 418, 424, 747 A.2d 526 (2000). "In nonconstitutional claims, the [party challenging the ruling] has the burden of demonstrating the harmfulness of the claimed error. . . . He [or she] must show that it is more probable than not that the claimed error affected the verdict." (Internal quotation marks omitted.) Id.

Here, the defendant has failed to explain how he was prejudiced by excluding Hill's testimony. The defendant does not deny that he was taking care of the victim during the morning of December 8, 1996, that he telephoned Graham to say that something was wrong with the victim, and that he drove the victim and Graham to the medical center. The defendant also has not challenged the associate medical examiner's testimony that the victim died as the result of blunt trauma to his liver, an injury that occurred within an hour of his death.

The defendant claims that he was not able to demonstrate Graham's bias, motive or interest in testifying

falsely and relies primarily on *State* v. *Colton*, 227 Conn. 231, 249, 630 A.2d 577 (1993), on appeal after remand, 234 Conn. 683, 663 A.2d 339 (1995), cert. denied, 516 U.S. 1140, 116 S. Ct. 972, 133 L. Ed. 2d 892 (1996). We are mindful that, in his brief, the defendant states that his defense was that he was not responsible for inflicting *all* of the victim's injuries. We see no relationship between that theory of defense and Graham's state of mind concerning the defendant's lack of fidelity to her. As noted, the associate medical examiner testified that the victim's death was caused by blunt trauma to his liver that occurred shortly before his death. There was no serious question about the defendant's being the only person with the victim during the morning of December 8, 1996.

Furthermore, the facts of this case are distinguishable from *Colton*, in which the state's entire case rested on the testimony of one witness who came forward one year after the victim's murder, claiming that she saw the defendant commit the crime. Prior to the witness' identification, the defendant was not a suspect in the case. The defendant sought to impeach the witness' testimony by showing that she had come forward only to obtain the reward money that was offered shortly before she identified herself. Id., 234. The witness, who at the time of the murder was a known drug user and prostitute, testified that she did not immediately come forward with information about the crime because she did not want to be viewed as a "snitch" on the street and thereby hamper her ability to obtain drugs. Id., 237. She came forward later because she needed to unburden herself of the emotional anguish she was suffering from not having revealed what she knew about the murder. She denied any interest in the reward. Id., 240. She also testified that at the time of trial, she was no longer addicted to drugs or involved in prostitution, and that her financial needs were provided for by her

former husband or her boyfriend. Id., 241. In other words, she was leading a new life.

To discredit the witness, the defendant in *Colton* offered various information, including the testimony of two witnesses that during 1990, including the time of the defendant's second trial, the witness continued to engage in illegal drug use, which she funded through prostitution. Id., 243–44. The trial court did not allow the evidence, ruling that it was collateral, cumulative and irrelevant. Id., 242–44. Our Supreme Court reversed the judgment of conviction because the case turned on the credibility of this sole witness. The court held that "the exclusion of extrinsic evidence . . . so significantly bore on the motive, bias and interest of [the witness] that the exclusion infringed on the defendant's confrontation rights." Id., 250.

The state's case here did not hinge solely on Graham's testimony. There was evidence from the associate medical examiner and others from which the jury could infer that the defendant was responsible for the victim's death. The defendant thus has not shown that it is more probable than not that the court's ruling affected the jury's verdict. See *State* v. *Nguyen*, 52 Conn. App. 85, 93, 726 A.2d 119 (1999), aff'd, 253 Conn. 639, 756 A.2d 833 (2000). The court therefore properly exercised its discretion in excluding Hill's testimony.[4]

## II

The defendant's second claim is that the court violated his constitutional right[5] to a fair and impartial

---

[4] Our review of the transcript also revealed that the state, in objecting to Hill's testimony, argued that if the defendant had wanted to impeach Graham he could have done so during cross-examination. Defense counsel countered that such an argument presumed that the defendant knew of Graham's threat at the time of her cross-examination. Defense counsel's argument is disingenuous, as Hill's proffered testimony was to repeat what Graham told the defendant the consequences of his infidelity would be.

[5] The defendant claims that the court violated his rights pursuant to the fourth, fifth and fourteenth amendments to the United States constitution and article first, § 8, of the constitution of Connecticut.

jury, and violated Practice Book § 42-14[6] by failing to tell the jurors at the end of the first day of evidence *not to discuss the case*. The defendant *did not preserve* this claim at trial and seeks review under the plain error doctrine pursuant to Practice Book § 60-5[7] or, in the alternative, under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[8] Because the court's failure to tell the jury at the end of the first day of evidence not to discuss the case does not constitute plain error and fails to meet the third prong of *Golding*, the defendant cannot prevail on this claim.

The following facts are relevant to this claim. Evidence began on December 1, 1997. At various times that day, prior to excusing the jury, the court told the jury "not to discuss the case" outside the courtroom. When the jury was excused for the luncheon recess, the court told the jury, "Do not discuss the case among yourselves or with anyone else." When the jury was excused at the end of the day, the court stated: "Ladies and gentlemen, we're going to suspend now for the

---

[6] Practice Book § 42-14 (a) provides in relevant part: "The judicial authority shall admonish the jurors not to read, listen to or view news reports of the case or to discuss with each other or with any person not a member of the jury the cause under consideration, except that after the case has been submitted to the jury for deliberation the jurors shall discuss it among themselves in the jury room."

[7] Practice Book § 60-5 provides in relevant part: "The court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ."

[8] In *Golding*, our Supreme Court held "that a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.

day. The balance of the testimony to be offered by Ms. Graham will be done in the morning, and then the state will call further witnesses, which may well take the full day.

"There may be some expression of this case by journalists or some other person in the media. You must avoid it and not read it, and *not listen to anybody's comments that might come either through that source or through any other source as I indicated to you before this trial started,*[9] before the evidence started, so that's most important. This may well continue through the trial or it may be on and off and not on a daily basis, but there may well be reportings of this case, so please be very mindful of that and not be exposed to it.

"So, when you come in in the morning, which will be the same—approximately the same time as today, go up to the fourth floor, and I will expect that we will—unless something unforeseen happens—that we will be proceeding at 10 a.m. so that prior to 10 a.m. you'll be brought down here, if all is well at that time. If not, we'll approximate some other time, but I don't expect any other time than 10 a.m. for starting tomorrow. So, you're excused for the night. We'll see you all in the morning.

"Adjourn court, sheriff." (Emphasis added.)

When construing our rules of practice, we are guided by the well known principles of statutory construction. "The rules of statutory construction apply with equal force to Practice Book rules. *Grievance Committee* v. *Trantolo,* 192 Conn. 15, 22, 470 A.2d 228 (1984). Where the meaning of a statute [or rule] is plain and unambiguous, the enactment speaks for itself and there is no occasion to construe it. Its unequivocal meaning is not

[9] During jury selection, the court instructed the venire panels in substantial compliance with Practice Book § 42-14.

subject to modification by way of construction. . . . Id." (Internal quotation marks omitted.) *Pitchell* v. *Hartford*, 247 Conn. 422, 432, 722 A.2d 797 (1999).

Practice Book § 42-14 simply requires the judicial authority to tell "the jurors not to read, listen to or view news reports of the case or to discuss with each other or with any person not a member of the jury the cause under consideration" until the jury retires to deliberate. Section 42-14 does not say when the court is to admonish the jury nor how many times the jury is to be told not to pay attention to news reports or discuss the case with anyone until deliberations begin. We have reviewed the transcript of the first day of trial and determined that the court did everything required under our rules of practice with respect to admonishing the jury. The defendant has not pointed to any statute or case law to the contrary.

"Plain error is reserved for instances where the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. *State* v. *Thomas*, 214 Conn. 118, 120–21, 570 A.2d 1123 (1990). Our Supreme Court has stated that a trial court's failure to follow the mandatory provisions of a statute prescribing trial procedures or to follow a procedural rule constitutes plain error. *State* v. *Johnson*, 214 Conn. 161, 171 n.10, 571 A.2d 79 (1990); *State* v. *Pina*, 185 Conn. 473, 482, 440 A.2d 962 (1981)." *State* v. *Robins*, 34 Conn. App. 694, 706, 643 A.2d 881 (1994), aff'd, 233 Conn. 527, 660 A.2d 738 (1995).[10] The third prong of *Golding* requires that a constitutional violation must clearly exist before a defendant can prevail on an unpre-

---

[10] In his brief, the defendant argues that we should be guided by *State* v. *Robins*, supra, 34 Conn. App. 694, stating that in that case, this court "held that a similar failure to follow [Practice Book] § 42-14 rose to the level of plain error." That statement is a patent misreading of the facts of *Robins*, in which the trial court told the jurors that they could discuss certain aspects of the trial with their families. Id., 705.

served claim of constitutional error. The defendant has not demonstrated that the court failed to follow the mandate of Practice Book § 42-14 and, thus, there is no plain error or constitutional violation.

### III

The defendant's third claim is that the court improperly diluted the state's burden of proof when it instructed the jury that "a reasonable doubt is a doubt for which a valid reason can be assigned" and that it "is a doubt which you can in your own mind give a reasonable—give a reason for conscientiously." The defendant failed to submit a request to charge and failed to take an exception to the charge that was given. He therefore seeks review under *State* v. *Golding*, supra, 213 Conn. 239–40. The defendant concedes that our Supreme Court has upheld similar language. He therefore is unable to show that he was clearly deprived of a constitutional right.[11]

The judgment is affirmed.

In this opinion the other judges concurred.

---

[11] In his brief to this court, the defendant concedes that our Supreme Court has upheld similar jury instructions: "The defendant is aware that [our] Supreme Court has previously rejected claims challenging similar language in the trial court's instructions. See, e.g., *State* v. *Ellis*, 232 Conn. 691, 705, [657 A.2d 1099] (1995), and cases cited therein. Nevertheless, the defendant continues to believe this language is constitutionally deficient."

This court has repeatedly said that as an intermediate appellate court, it is not our role to overturn our Supreme Court's holdings, and we decline the defendant's invitation to do so. See, e.g., *State* v. *Fuller*, 56 Conn. App. 592, 609, 744 A.2d 931, cert. denied, 252 Conn. 949, 748 A.2d 298 (2000); *State* v. *Oliver*, 41 Conn. App. 139, 146, 674 A.2d 1359, cert. denied, 237 Conn. 920, 676 A.2d 1374 (1996).