### STATE OF CONNECTICUT *v.* LUIS GALARZA
### (AC 26646)

Schaller, Flynn and Stoughton, Js.[1]

---

[1] The listing of judges reflects their status on this court at the time of oral argument.

Argued January 17—officially released September 12, 2006

*Anna-Liisa Joseloff*, pro hac vice, and *Carmine Perri*, with whom was *Mark Rademacher*, assistant public defender, for the appellant (defendant).

*C. Robert Satti, Jr.*, senior assistant state's attorney, with whom, on the brief, was *Jonathan C. Benedict*, state's attorney, for the appellee (state).

*Opinion*

FLYNN, J. A jury found the defendant, Luis Galarza, guilty of two counts of murder in violation of General Statutes § 53a-54a (a) and one count of capital felony in violation of General Statutes § 53a-54b (8).[2] The trial court merged the two counts of murder into the count of capital felony and sentenced the defendant to life imprisonment without the possibility of parole. The defendant appealed to our Supreme Court, which transferred the appeal to this court pursuant to General Statutes § 51-199 (c).

On appeal, the defendant claims that the trial court denied him the constitutional right (1) to confront witnesses against him by admitting into evidence a statement made by one of the victims hours before he was murdered, and (2) to present a defense and the right to the effective assistance of counsel by limiting counsel's (a) cross-examination of certain witnesses and (b) final argument, and that (3) the prosecutor committed misconduct during closing argument. We affirm the judgment of the trial court.

This case concerns the murders of half-brothers Magdiel Rivera, Jr., and Luis Velez. The jury reasonably could have found the following facts. On the afternoon of October 14, 1999, Maggie Montes and her husband, Edwin Bonilla, were at the Trumbull Mall and encountered the victims, individuals with whom they were acquainted. Montes testified that everyone was happy. Rivera received a page, however, and then made a telephone call. As a result of the telephone call, Rivera's

---

[2] The jury found the defendant not guilty of two counts of felony murder in violation of General Statutes § 53a-54c.

expression changed. He left the mall alone between 4 and 5 p.m. Montes and Bonilla remained at the mall and later returned with Velez to their home in Bridgeport, where Rivera joined them. The four individuals got into Rivera's brown colored van and drove about Bridgeport. While they were in the van, Rivera received another page and drove to a bar called the Latin Spirit Club. In Montes' opinion, Rivera was not acting like himself.

Montes had never been to the Latin Spirit Club before and described it as being a place in which she was uncomfortable. Most of the patrons were men between the ages of seventeen and twenty-five, wearing hooded sweatshirts and army fatigue pants with firearms clipped to them. Montes was nervous because everyone looked suspicious and was whispering and looking over their shoulders. Montes stood by the bar and watched Rivera walk to the back of the room. The door to the restroom was ajar, and Montes could see a figure standing at the door. The door was opened for Rivera to enter and closed behind him. Rivera remained in the restroom for ten to fifteen minutes. When he exited, Rivera told Montes, Bonilla and Velez to leave the Latin Spirit Club immediately. Montes described Rivera as looking shocked. Bonilla walked beside Rivera as they proceeded to the van. Rivera and his companions returned to Montes' home, where they sat in the van talking. The substance of their conversation concerned what Rivera had heard in the restroom, an alleged plot to take his life. See part I. Montes told Rivera three or four times not to go where he had stated he intended to go. Montes and Bonilla entered their apartment shortly after midnight, leaving the victims in the van.

At approximately 12:30 a.m. on October 15, 1999, the victims arrived at 116 Corn Tassel Road, Bridgeport, a private home, and parked the van on the street in front of the house. At the time, the victims were in possession

of a large quantity of cocaine in powder form, which they intended to process into crack cocaine with the assistance of someone in the house. The approximate value of the cocaine was $40,000 to $50,000. About an hour after the victims entered the residence, they left with the crack cocaine. Very soon thereafter, the residents heard gunshots coming from the street and telephoned the police. Others in the neighborhood also telephoned the police about hearing gunshots.

Benjamin Mauro, a patrol officer, was dispatched to the residence at about 2 a.m. He found the victims, shot multiple times, inside the van. The window of the passenger door had been shot out. Rivera's body was in the operator's seat with the keys in his hand. Velez' body was on the floor between the front seats. Although no murder weapon was recovered, ten spent nine millimeter shell casings and thirteen bullets and bullet fragments were found at the scene.[3] Ballistics tests revealed that the bullets were all fired from the same gun. A forensic medical examination of the victims' wounds demonstrated that gunshots had been fired through the window of the passenger's side of the van. The injuries caused by bullets on Velez' body revealed that he had turned away from the window when the gunshots were fired. The police recovered no drugs or guns at the scene.

No one witnessed the murders. The defendant, however, was arrested for the crimes on November 15, 2001, on the basis of statements made by numerous individuals acquainted with both the defendant and the victims. The state prosecuted the defendant on the theory that he had murdered the victims as the result of an escalating dispute between him and Rivera as to the distribution of illegal narcotics in a particular area of

---

[3] There are a number of types of firearms that use nine millimeter bullets, including a Taurus. The defendant was known to own a Taurus, but his Taurus was never recovered.

Bridgeport.[4] The defendant's theory was that others were responsible for the deaths of the victims. The jury found the defendant guilty of two counts of murder and one count of capital felony.

I

The defendant's first claim is that the court denied him his state[5] and federal constitutional rights to confront witnesses against him by admitting into evidence a statement Rivera had made several hours before he was killed. Assuming without deciding that the defendant was denied the right to cross-examine the witness, we conclude, nonetheless, that the admission of the statement was harmless beyond a reasonable doubt because there was sufficient other circumstantial evidence from which the jury reasonably could have concluded beyond a reasonable doubt that the defendant was responsible for the death of the victims.

The following facts are relevant to the defendant's claim. At trial, Bonilla testified as to what Rivera had told him after they left the Latin Spirit Club:[6] "We got

[4] The substitute information alleged, in part, as to the respective counts of murder: "[A]t or about 1:50 a.m. at the area of 116 Corn Tassel Road, Bridgeport, [the defendant] and others unknown, acting with the intent to cause the death of [Magdiel Rivera, Jr./Luis Velez] did shoot with a firearm, and cause the death of said [Rivera/Velez] . . . ."

As to the count of capital felony, the substitute information alleged, in part, that the defendant "and others unknown, did shoot with a firearm and cause the death of two persons at the same time and in the course of a single transaction, to wit: Magdiel Rivera, Jr., and Luis Velez . . . ."

[5] To the extent that the defendant asserts a claim in violation of article first, § 8, of the constitution of Connecticut, his claim does not meet the standard enunciated in *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992) (defendant must provide independent analysis under particular provision of state constitution). See *State* v. *Pierre*, 277 Conn. 42, 74 n.12, 890 A.2d 474, cert. denied, 547 U.S. 1197, 126 S. Ct. 2873, 165 L. Ed. 2d 904 (2006). Because the defendant's state constitutional claim was not briefed, we deem it abandoned.

[6] Prior to Bonilla's testifying about the conversation he and Rivera had in the van, the court held a hearing on a motion in limine filed by the defendant to preclude testimony as to Rivera's statement.

in the van and sat down, and I asked him, 'Why you look like that? Why you upset?' He said, 'Because I just found out that somebody just paid to kill me.' And I said, 'Who? What you talking about?' And he said, '[The defendant] just paid a guy I seen in the bathroom.' I said, 'Who is that?' I wanted to know who was in the bathroom. And he said, '[Jose Arciniega]. He paid him. He was my friend. And he said that . . . .' "[7] At the conclusion of Bonilla's testimony,[8] the court gave a limiting instruction, telling the jury that Rivera's statement was not admitted for the truth of the matter.

The defendant contends that the admission of Rivera's statement into evidence deprived him of the right to confront the witnesses against him. A conclusion that a defendant's constitutional rights were violated by the admission of an out-of court statement is subject to harmless error analysis, which will result in a new trial only if the evidence admitted was not harmless beyond a reasonable doubt. *State* v. *Peeler*, 271 Conn. 338, 399, 857 A.2d 808 (2004), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005). The state bears the burden of proving that the evidence was harmless beyond a reasonable doubt. *State* v. *Carpenter*, 275 Conn. 785, 832, 882 A.2d 604 (2005), cert. denied, 547 U.S. 1025, 126 S. Ct. 1578, 164 L. Ed. 2d 309 (2006). We conclude, on the basis of our review of the entire trial transcript, including the court's limiting instruction to

---

[7] On cross-examination, Bonilla testified in response to questions from defense counsel, in part, as follows:

"Q. . . . Didn't you also tell the police that [Rivera] said that [Arciniega] told him not to worry? We're boys, you and me. And so what I'm going to do is, I'm going to make believe that I'm going to kill you. And at the last minute, we're going to have a meeting and [the defendant] is going to be there. And at the last minute, I'm going to turn my gun and kill [the defendant]?

"A. He said he was going to go against him.

"Q. Against [the defendant], correct?

"A. Correct."

[8] The defendant later made an oral motion to strike Bonilla's testimony as to the statement and a motion for a mistrial. The court denied both motions.

the jury, that the admission of the evidence was harmless beyond a reasonable doubt.

"Whether a constitutional violation is harmless in a particular case depends upon the totality of the evidence presented at trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless." (Internal quotation marks omitted.) Id. "Whether such error is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Colton*, 227 Conn. 231, 254, 630 A.2d 577 (1993), on appeal after remand, 234 Conn. 683, 663 A.2d 339 (1995), cert. denied, 516 U.S. 1140, 116 S. Ct. 972, 133 L. Ed. 2d 892 (1996).

The fact that the jury found the defendant guilty weighs heavily in our decision because the jury decided the credibility of the witnesses. The jury had to decide which version of a witness' testimony was credible, that which was presented by the state or that which was revealed during rigorous cross-examination by defense counsel. There were no eyewitnesses to the crimes, and the issue at trial was the identity of the perpetrator.

Beyond the photographs depicting the physical evidence of the crime scene, the autopsy and ballistics reports, the state's case was one of circumstantial evidence adduced from witnesses familiar with both the defendant and the victims. Save for the testimony of law enforcement personnel and others in the criminal

justice system, the witnesses were either convicted felons or their wives or paramours who were involved in or benefited from illegal drug sales. As counsel for both the state and the defendant elicited, each of these witnesses had a motive for testifying, primarily an expectation that the sentence the felon currently was serving or the one about to be imposed would be reduced in exchange for testimony favorable to the state. Two of the witnesses agreed to provide statements to the police after listening to a tape recording in which the defendant accused them of murdering the victims. The jury heard testimony about illegal drugs and disputes between the men who sold illicit drugs for either the defendant or Rivera, sometimes both. Nine millimeter guns were a part of everyday life, as were attempted assassinations. The witnesses spoke of deals and double deals, alliances and counteralliances, the mothers of their children and their girlfriends. Most of the witnesses lived by their wits and generally demonstrated poor judgment or lack of moral character. In short, the witnesses did not possess those qualities that generally indicate to a law-abiding society an individual's penchant for truthfulness.

The jury in this case had an enormous task in weighing the evidence to assess the credibility of the witnesses. That task, however, is the raison d'etre of our jury system. See *State* v. *McFarlane*, 88 Conn. App. 161, 169, 868 A.2d 130 ("responsibility of the jury to weigh conflicting evidence and to determine credibility"), cert. denied, 273 Conn. 931, 873 A.2d 999 (2005). As this court and our Supreme Court have stated so many times, it is not our function to second-guess a jury verdict founded upon credibility, as credibility is not something that can be gleaned from the written page. See *State* v. *Hunt*, 72 Conn. App. 875, 884, 806 A.2d 1084, cert. denied, 262 Conn. 920, 812 A.2d 863 (2002). The transcript of this case, more than most,

exemplifies that truism, as defense counsel repeatedly pointed out inconsistencies in and ulterior motives for the testimony of witnesses. See *State* v. *Colton,* supra, 227 Conn. 249 (defense counsel is permitted to expose to jury facts from which jurors could draw inferences relating to credibility of witnesses). We are aware that in addition to listening to the testimony of the witnesses, much of which the jurors asked to have read back to them, the jurors had the opportunity to observe the defendant as the witnesses testified. See *State* v. *Hunt,* supra, 884.

The defendant was given a full and effective opportunity to cross-examine the witnesses. During his cross-examination of Bonilla, defense counsel demonstrated why Arciniega's statement to Rivera lacked credibility; although Arciniega had represented that he would shoot the defendant, rather than Rivera, the defendant was still alive. See footnote 7.

Furthermore, the court denied the defendant's motions for a judgment of acquittal at the conclusion of the evidence and for a new trial. "The existence of conflicting evidence limits the court's authority to overturn a jury verdict [and] . . . [t]he jury is entrusted with the choice of which evidence is more credible and what effect it is to be given." (Internal quotation marks omitted.) *Childs* v. *Bainer,* 235 Conn. 107, 116, 663 A.2d 398 (1995). The court is in a better position than we, on the basis of the written record, to gauge the tenor of trial and to detect factors, if any, that could influence the jury. *State* v. *Davis,* 61 Conn. App. 621, 633, 767 A.2d 137, cert. denied, 255 Conn. 951, 770 A.2d 31 (2001).

We also note that the court instructed the jury immediately after Bonilla testified that Rivera's statement was not being offered for the truth of the matter, but merely as evidence of his state of mind. Unless there is some indication to the contrary, a jury is presumed

to follow the court's instruction.[9] *State* v. *Vargas*, 80 Conn. App. 454, 468, 835 A.2d 503 (2003), cert. denied, 267 Conn. 913, 840 A.2d 1175 (2004).

To whatever extent, if any, that Rivera's statement was evidence of his then state of mind, it was cumulative. Both Montes and Bonilla testified as to Rivera's demeanor, which they observed firsthand, when he left the restroom. See *State* v. *Thomas*, 205 Conn. 279, 285, 533 A.2d 553 (1987) (nonassertive conduct such as shaking is not hearsay).

There was no controversy that the defendant was a known drug dealer who claimed the right to sell his drugs in a certain part of east Bridgeport. It also is clear that the defendant was unhappy that Rivera and his associates were selling drugs in the territory he claimed. A number of witnesses testified that the defendant bragged about shooting the victims, and there was evidence from which the jury could infer not only that the defendant had a motive to kill Rivera, but also the means to do so.

Alan Lane, who sold drugs for the defendant, saw him with guns, including a nine millimeter gun. A few days before Halloween, 1999, the defendant approached Lane and offered him $10,000 to murder a man nicknamed Fuji,[10] who was seeing the mother of the defendant's children.[11] When Lane refused, the defendant stated that he would do it himself, just as he had done to two men who had tried to take his block away. The defendant wanted to know if Lane had read about the murders in the newspaper. The defendant told Lane that he and a man named Danny had caught the victims

---

[9] The defendant argues that the state ignored this instruction by arguing Rivera's statement for its truth during final argument. See part III.

[10] Fuji is also known as Terrence T. Brown.

[11] Roxanne Balarezo is the mother of the defendant's children. The defendant, however, lived with his girlfriend, Jennifer Capozziello. Balarezo and Capozziello did not get along with each other.

in a van at Beardsley Park and "lit it up." Lane was a convicted felon who hoped to reduce the term of the sentence he was serving in exchange for his testimony. He also bore a grudge against the defendant, who failed to help him post bail.

Jose Alvarado, who also had a motive to kill Rivera; see part II; gave a statement to the police about the statements the defendant had made to him.[12] According to Alvarado, who sold drugs for the defendant, the defendant did not like Rivera. The defendant told Rivera that he ran the east side of Bridgeport and that Rivera should keep his people in his spot. The defendant provided Arciniega with drugs and money. The defendant bragged that he had the money to pay anyone to do anything he wanted. The defendant first said that he would pay Arciniega $10,000 to kill Rivera because he would do it cheaply. If the defendant could get Arciniega's Porsche out of the garage, Arciniega would do anything for the defendant. Alvarado saw the defendant with several guns, including a nine millimeter Taurus handgun. Alvarado heard the defendant offer Arciniega money to kill Rivera. When Alvarado spoke to the defendant about the victims' murders, the defendant responded, "What you want me to do? F--- them niggers."

Roberto Hernandez, another witness who had a motive to kill Rivera; see part II; testified about the drug rivalry between the defendant and Rivera. Hernandez, in fact, was selling drugs for both men. Hernandez began his relationship with Rivera in August or September, 1999. During that period of time, in the presence of Arciniega, the defendant confronted Hernandez, while

---

[12] Alvarado was an uncooperative witness when first called by the state. Statements that he gave to the police were read to the jury pursuant to *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). Before he testified on cross-examination, Alvarado obtained a grant of immunity from the state.

holding a gun to his face, saying that he did not want Hernandez to sell Rivera's drugs on the defendant's block. After the murders, the defendant told Roberto Hernandez that "Jose didn't hesitate to kill him. . . . Jose took the drugs and gave him the guns . . . . Jose didn't hesitate to kill 'em. He lit 'em up . . . . Jose lit up the van. . . . Rivera's little brother tried to run and got shot up." Arciniega took the drugs and money and the defendant took the guns.

On direct examination, Carlos Hernandez testified that he knew the defendant and spent time at the grocery store the defendant owned, Luis Market. Prior to the murders, the defendant related to Carlos Hernandez that he and Rivera had had a shoot-out over drug money. Carlos Hernandez was at the Latin Spirit Club the night before the murders and saw both Rivera and Arciniega there. Carlos Hernandez read about the murders in the newspaper. When he saw the defendant the next day, he asked him if he had seen the newspapers. Carlos Hernandez testified that "[the defendant] started laughing and he told me that he was the one that did it. He pointed and went like this.[13] And he just told me to keep my mouth shut. He was, like, don't say nothing, and he winked at me." On redirect examination, Carlos Hernandez testified that "when he shot [Rivera], he shot him in the lower bottom of his head. Right here. That he was trying to take—they robbed him [for the cocaine]. He was trying to take his chain, but he panicked because when he was asking Ho, they both panicked. And he didn't want to take the chain. He was drunk at Club Hollywood. He told me he shot the defendant right here. And shot him on the side, too."[14]

---

[13] Carlos Hernandez later explained the defendant's gesture. The defendant imitated as if he were pointing a gun and shooting.

[14] The sites of Rivera's wounds, according to the testimony of Carlos Hernandez, were consistent with the testimony given by the medical examiner who conducted the autopsy and the photographs that were taken of Rivera's wounds.

According to Carlos Hernandez, the murder was over a drug debt, not a turf war, and Arciniega was a fifty-fifty partner with the defendant.

The jury was aware that Carlos Hernandez was a police informant who first discussed this case with the police in November, 1999, at which time he indicated that another individual was responsible for the murders. He did not tell the police about his postmurder conversation with the defendant at that time. Before the trial of this case, Carlos Hernandez contacted the police to reveal his conversations with the defendant, hoping that his testimony would influence positively the fifteen to twenty year sentence he was facing in federal court.

Detective Gregory Nilan of the Stratford police department was a member of the Drug Enforcement Administration task force. He arrested the defendant for possession of narcotics on November 5, 1999. The defendant provided reliable information about drug trafficking in the Bridgeport area. On November 8, 1999, the defendant told Nilan that "he had information that he knew there was two Hispanic males that had been shot in the north end of Bridgeport, and that he had heard that it was a hit out of New York because they owed money. And then he indicated to me he knew there was a trap inside of the vehicle that the deceased were found in."

Jesus Lugo and the defendant were incarcerated together at the Walker Reception/Special Management Unit correctional facility. The defendant confided in Lugo that he had committed a robbery in New York and urged Lugo to inform the authorities in order to get a reduction on his prison sentence. Lugo did so and received a six month reduction of his sentence. The defendant also told Lugo about the subject murders. Lugo testified that the defendant said that "there was two kids that were always selling on one of his streets.

I guess he owned the street, whatever, he sold drugs on. And the two kids were selling on his street. And he warned them not to sell on the street. . . . He basically told me he had them killed for selling on his street. . . . Shot 'em up in a van. They was in a van. They was leaving the street getting into a van. And he said one— him and one of his friends shot the van up. . . . Drugs. And he told me when the kid died, he had the keys to the van in his hands. . . . He said when they shot him up, they robbed the kids for the drugs they had in the van. . . He said he had paid the kid that did the murder with him for helping him kill the two kids . . . Gs; that's just thousands." Lugo testified that he knew about the murders for some time before passing it on to the authorities in January, 2001. At that time, Roberto Hernandez was being blamed for the murders. Lugo was willing to pass on the information about the New York robbery right away, but not the murders, because he was hoping to become one of the defendant's associates in the drug trade.

Steven Necaise knew the defendant and had visited him in his grocery store. The defendant told Necaise that the police were coming to his house and his mother's house to discuss the subject murders. Just prior to trial, Necaise asked his lawyer to approach the police to provide a signed written statement in which he related that the defendant had told him that he had committed the murders and that cocaine was involved. The defendant was shaken up. Approximately one month before trial, Necaise saw the defendant outside a prison chapel. The defendant asked him why he had gone to the state's attorney and warned him not to sign anything. The defendant was emotional and nervous. There were numerous state's witnesses, who, if believed, connected the defendant to the commission of the charged crimes.

For the foregoing reasons and on the basis of the conflicting testimony that was presented to the jury for its credibility determination, we conclude that Bonilla's testimony concerning Rivera's out-of-court statement was harmless beyond a reasonable doubt.

II

The defendant's second claim is that the court violated his state[15] and federal constitutional rights to present a defense, to the effective assistance of counsel and to the evenhanded application of the rules of evidence because he was not permitted to ask Alvarado and Roberto Hernandez whether they had murdered the victims or to argue that those witnesses were responsible for the victims' murders. The defendant argues that the court improperly based its ruling on the lack of direct evidence that the witnesses were responsible for the deaths of the victims. We disagree.

During opening statements to the jury, defense counsel argued, "[A]t least two of these people that were within the circle of individuals [the prosecutor] was referring to, at least two of them are, in all likelihood, the real killers in this case . . . ."[16] Defense counsel identified Alvarado and Roberto Hernandez as the real

---

[15] Again, the defendant has failed to present an analysis of his state constitutional claims. We therefore will review only his federal constitutional claims. See footnote 5.

[16] Defense counsel argued, in part, that "some people . . . are going to take the [witness] stand and they're going to say [the defendant] told me he did it. . . . [T]hey're not priests or nuns or rabbis or counselors or anything like that, you know, and that's number one. Number two, these are not people who came forward a day or a week or a month after this whole thing happened and said to the police on their own. . . . No. I know and I'm telling you, I'm going to prove this to you and you're going to see that at least two of these people . . . that were within the circle of individuals [the prosecutor] was referring to, at least two of them are, in all likelihood, the real killers in this case, okay, and I'm going to give you their names. . . . They're critical. You are going to see them here. They are going to testify. . . . Jose Alvarado. And there is another guy named Roberto Hernandez."

killers. At the end of defense counsel's statement, the state asked the court to take curative measures with respect to what it considered to be improprieties in defense counsel's opening statement, including the argument that Alvarado and Roberto Hernandez were the real killers. The state asked the court to rule on the motion in limine it had filed previously. Defense counsel argued that there was sufficient circumstantial third party evidence to assert third party culpability. The court stated that it would give the usual jury instruction that the arguments of counsel are not evidence, but would reserve its decision with respect to the argument about who the real killers were.

The argument of defense counsel is grounded in events that took place approximately two or three weeks before the victims were murdered. Rafael Colon was one of the first witnesses to testify. On or about September 22, 1999, he, Alvarado and Roberto Hernandez were at the home of Jose Valentine, where guns, including nine millimeter guns, were present.[17] At that time, Colon overheard Alvarado speaking on the telephone about doing something bad. At the conclusion of the telephone conversation, Alvarado and Roberto Hernandez excitedly put on bulletproof vests and armed themselves. Colon asked them who they were going to get. Alvarado said, "[Rivera] . . . a motherf---er named [Rivera]." Alvarado and Roberto Hernandez left in a blue Honda motor vehicle. Colon did not hear the voice of the person to whom Alvarado was speaking or ask Alvarado to whom he had spoken. Colon believed that Alvarado and the defendant were cousins and best friends. Colon assumed, therefore, that Alvarado had been talking to the defendant because whenever Rivera was on the east side of Bridgeport, someone was watching him and talking to Alvarado.

---

[17] There was evidence that Roberto Hernandez was in possession of a nine millimeter Taurus.

Colon was upset by what Alvarado said because Rivera was his friend. Colon later met Rivera and informed him that two men were going to the east side to kill him and that one of them was the defendant's cousin. Rivera had a nine millimeter handgun with him. The next afternoon, Rivera told Colon that he had contacted Alvarado. The victims attempted to shoot Alvarado, but the gun jammed. Rivera burned Alvarado's motor vehicle.

On cross-examination, the defendant elicited evidence that Colon first talked to the police about the murders in November, 1999,[18] at which time, he identified Valentine as the person who was on the telephone with Alvarado. Also, in a written statement he gave to the police in June, 2001, Colon said that an individual had telephoned Alvarado. The first time Colon identified the defendant as the person with whom Alvarado was speaking was at trial.

Alvarado also testified about the incident. Although he denied Colon's testimony about the events at Valentine's house, he admitted that he drove a blue Honda motor vehicle. Because Alvarado could not remember what he had told the Bridgeport police in two signed statements, they were read to the jury pursuant to *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). Alvarado's December 2, 1999 statement concerned the burning of the Honda. According to that statement, at approximately 8:30 p.m. on or about September 22, 1999, Alvarado was driving the Honda on Ogden Street when

---

[18] Colon was arrested in Greenwich on November 1, 1999, while delivering to Rivera's father a large quantity of crack cocaine and a gun that had belonged to Rivera. According to Colon, Rivera's father had set him up to be arrested by the drug enforcement agency. Colon had obtained the drugs from Bonilla. Colon gave an oral statement to the police regarding the matters about which he testified in November, 1999, and a written statement to the Bridgeport police in June, 2001.

he saw the victims in the van. Alvarado and Rivera exchanged looks. Alvarado turned his vehicle around and was in his vehicle talking to some women on the street when he saw Rivera's brown van coming toward him. Roberto Hernandez told Alvarado to leave quickly. They drove through the streets of Bridgeport with the victims following them for a time.

Alvarado then partied with Roberto Hernandez near Seaside Park but took him home at about 11:30 p.m. Thereafter, Alvarado went to visit Valentine at the Cambridge Apartments. As Alvarado was parking his car, he looked out the operator's window and saw a burgundy Eurosport wagon with two Hispanic males in it. Velez was pointing a gun at Alvarado, and Rivera was telling him to shoot. Alvarado jumped out of the passenger door, ran behind the apartments and jumped a fence. The victims chased him. When Alvarado returned to where he had left the Honda, it was missing. The victims had taken and burned it. Two days later, Rivera paid Alvarado $800 for the Honda and said there had been a misunderstanding. Roberto Hernandez was not with Alvarado when Velez pointed a gun at him, but he saw the Honda after it had been destroyed.

After Alvarado's direct testimony, the state asked the court to preclude defense counsel from cross-examining Alvarado and Roberto Hernandez as to whether they killed the victims. The state made an offer of proof as to the testimony Roberto Hernandez would offer. The state argued that the cross-examination it sought to preclude was third party suspect evidence and that the defendant had no direct evidence linking Alvarado and Roberto Hernandez to the murder of the victims. Defense counsel contended that Valentine, Alvarado and Roberto Hernandez conspired to kill Rivera and that Alvarado and Roberto Hernandez had a motive to blame the defendant because he was talking to the Federal Bureau of Investigation about drug dealing in

Bridgeport. Defense counsel also argued that there was direct evidence that three weeks before the victims were murdered, Alvarado and Roberto Hernandez were stalking Rivera. After hearing the arguments of counsel and reviewing *State* v. *Colton*, supra, 227 Conn. 258, and *State* v. *Ortiz*, 252 Conn. 533, 563–64, 747 A.2d 487 (2000), the court precluded defense counsel from making the claim in the presence of the jury that Alvarado and Roberto Hernandez were the individuals who had murdered the victims. The court, however, permitted defense counsel to otherwise impeach the credibility of Alvarado and Roberto Hernandez.[19]

During cross-examination of Alvarado and Roberto Hernandez, defense counsel was able to elicit evidence that neither of the witnesses voluntarily went to the police to accuse the defendant of having killed the victims. The police told both Alvarado and Roberto Hernandez that they would be charged with the murders unless they cooperated with the police investigation. Although the defendant was acting as an informant for the Federal Bureau of Investigation, Roberto Hernandez denied that he accused the defendant of murdering the victims as "payback." While they were in prison, Alvarado and Roberto Hernandez discussed the murder of the victims and the defendant's involvement therein with inmates who testified at trial. Both Alvarado and Roberto Hernandez refused to talk to defense counsel or a private investigator unless the other was present.

The defendant has framed his second claim, in part, on constitutional grounds. Our resolution of his claim,

---

[19] The following colloquy took place between defense counsel and the court:

"[Defense Counsel]: What about on the issue of credibility? You mean I can't even ask them about what Colon said was true?

"The Court: Yes. I'll let you do that. What I'm saying is, you cannot put them on trial and accuse them of having committed the murders. That's what I'm saying. That's my ruling . . . ."

however, turns on evidentiary grounds. "Our Supreme Court has stated that the defendant's constitutional right to present a defense does not require the trial court to forgo completely restraints on the admissibility of evidence. . . . Generally, an accused must comply with established rules of procedure and evidence in exercising his right to present a defense. . . . A defendant, therefore, may introduce only relevant evidence, and, if the proffered evidence is not relevant, its exclusion is proper and the defendant's right is not violated." (Internal quotation marks omitted.) *State* v. *Eagles*, 74 Conn. App. 332, 335, 812 A.2d 124 (2002), cert. denied, 262 Conn. 953, 818 A.2d 781 (2003).

"[A defendant has] the right to present a defense [and] the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies." (Internal quotation marks omitted.) *State* v. *Cerreta*, 260 Conn. 251, 261, 796 A.2d 1176 (2002). In exercising his constitutional right to present a defense, "a defendant may introduce evidence which indicates that a third party, and not the defendant, committed the crime with which the defendant is charged. . . . The defendant, however, must show some evidence which directly connects a third party to the crime with which the defendant is charged. . . . *It is not enough to show that another had the motive to commit the crime . . .* nor is it enough to raise a bare suspicion that some other person may have committed the crime of which the defendant is accused." (Emphasis added; internal quotation marks omitted.) *State* v. *Ferguson*, 260 Conn. 339, 354, 796 A.2d 1118 (2002). "Unless that direct connection exists it is within the sound discretion of the trial court to refuse to admit such evidence when it simply affords a possible ground of possible suspicion against another person." (Internal quotation marks omitted.) *State* v.

*Baker,* 50 Conn. App. 268, 279, 718 A.2d 450, cert. denied, 247 Conn. 937, 722 A.2d 1216 (1998).

"The admissibility of evidence of third party culpability is governed by the rules relating to relevancy. . . . No precise and universal test of relevancy is furnished by the law, and the question must be determined in each case according to the teachings of reason and judicial experience. . . . The trial court has wide discretion in its rulings on evidence and its rulings will be reversed only if the court has abused its discretion or an injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Rivera,* 70 Conn. App. 203, 211, 797 A.2d 586, cert. denied, 261 Conn. 910, 806 A.2d 50 (2002). "Relevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence." Conn. Code Evid. § 4-3.

Third party culpability cases decided by our Supreme Court guide our decision.[20] Our Supreme Court reversed the conviction of the defendant in *State* v. *Echols,* 203 Conn. 385, 524 A.2d 1143 (1987), where the trial court excluded evidence of misidentification of the defendant by another victim of a similar sexual assault committed in the same area as the crime that was being prosecuted. Both victims gave similar descriptions of the physical characteristics of the perpetrator's face. After the second victim identified the defendant from a photographic

---

[20] The cases on which the trial court relied support its ruling precluding the third party culpability evidence proffered by the defendant. See *State* v. *Ortiz,* supra, 252 Conn. 563–65 (court excluded evidence that drug dealer had hired hit men to commit murder and identity of hit men because proffered evidence did not directly connect dealer with murder or that dealer committed murder rather than defendant); *State* v. *Colton,* supra, 227 Conn. 258–59 (not enough to show that another had motive to commit crime, nor is it enough to raise bare suspicion that some other person may have committed crime of which defendant accused).

array, the first victim also selected the defendant's photograph from a similar array. The defendant, however, was incarcerated at the time of the first sexual assault. Id., 388. Our Supreme Court concluded that "[i]n a case . . . where the identity of the assailant is essentially the sole issue at trial, evidence that a third party lookalike may have committed the crime with which the defendant is charged is highly relevant." Id., 393–94. Direct evidence similar in nature to the misidentification by the first victim is not present in the case before us.

*State* v. *Boles*, 223 Conn. 535, 613 A.2d 770 (1992), is nearly on point with the issue in this case. In *Boles*, the victim's decomposing body was found in a wooded area several days to two weeks after she was murdered. Id., 537–38. There were two eyewitnesses to the defendant's beating of the victim with a crowbar, and one of the witnesses testified that he had aided the defendant in putting the victim's body in a motor vehicle. At trial, the defendant wanted to present the testimony of two police officers who had investigated two complaints of kidnapping, sexual assault and unlawful restraint by a third party, which were made by the victim one month and one week prior to her death. Our Supreme Court upheld the trial court's decision to preclude the defendant from presenting the officers' testimony as to the complaints related to the third party because there was no evidence that the complaints were even "vaguely, connect[ed]"; (internal quotation marks omitted) id., 548; to the victim's death. Although the proffered testimony of the officers "indicated animosity between [the third party] and the victim, and that [the third party] might possibly have had a reason to harm the victim, it went no further. It would be sheer speculation to draw from the evidence presented an inference that [the third party] had killed the victim." Id., 549. Unless there is a direct connection between the third party

and the crime charged, "it is within the sound discretion of the trial court to refuse to admit such evidence when it simply affords a possible ground of possible suspicion against another person." (Internal quotation marks omitted.) Id., 549–50.

Although there was evidence of a rivalry, antagonism and animosity between Rivera and Alvarado and Roberto Hernandez, that in and of itself was not sufficient to connect them directly with the murder of the victims. In order to have cross-examined Alvarado and Roberto Hernandez as to whether they had killed the victims and to argue that theory to the jury, the defendant was required to make an offer of proof directly linking them with the crimes. See *State* v. *West*, 274 Conn. 605, 625, 877 A.2d 787 (not enough to show another had motive to commit crime), cert. denied, 546 U.S. 1049, 126 S. Ct. 775, 163 L. Ed. 2d 601 (2005). Because there was no direct evidence of third party culpability, the cross-examination proposed by the defendant was irrelevant in this case. We note, however, that during cross-examination, the defendant was able to bring out that Alvarado and Roberto Hernandez were suspects in the case at one time.

As to the defendant's claim that he was not permitted to argue that Alvarado and Roberto Hernandez were the "real killers," his counsel forcefully argued that these two men had a strong motive to kill Rivera.[21] We

[21] During final argument, defense counsel argued in part: "Believe these guys. Believe [Roberto] Hernandez and Alvarado, the two guys with the biggest motive in this case to lie. Was I wrong about that? Did I tell you that in the opening statement? These guys have the biggest motive to lie." "Hernandez and Alvarado. Again, the state has a big problem with Hernandez and Alvarado. You know why, ladies and gentlemen? Because somebody is lying. Either Colon is lying to you, or Hernandez and Alvarado are lying to you.

"You believe Hernandez and Alvarado? You believe them? You believe that [Alvarado] just happened to look at a girl one day and [Rivera] thought he was looking at him and doing it the wrong way and then torched his car? Or is it more likely that he had his gun in his vest, and [Rivera] knew that [Alvarado] and [Roberto Hernandez] were out there stalking him, that

therefore cannot say that the defendant was denied the effective assistance of counsel or the right to present a defense by the court's limiting the scope of his cross-examination and final argument. We therefore conclude that the court did not abuse its discretion by granting the state's motion to preclude.

### III

The defendant's last claim is that the prosecutor committed misconduct during final argument to the jury. Specifically, the defendant argues that the state made substantive use of Rivera's statement to Bonilla, rather than for its limited purpose of showing Rivera's state of mind.[22] See part I. We conclude that there was no prosecutorial misconduct during closing argument.

The following facts are relevant to our review. Prior to closing argument, defense counsel asked the court to instruct the prosecutor not to argue Rivera's statement for its truth, i.e., that the defendant had hired Arciniega to kill Rivera. The court did not give the requested instruction. During the state's final argument in chief, the prosecutor reminded the members of the jury that they were to decide the facts, thanked them for their commitment of time to the difficult task, outlined the charges in the information and reminded them

---

there was probably a confrontation, either shots fired or close to it. [Rivera's] life, very closely in danger of being taken away, and you think [Rivera] carried a grudge for the rest of the day? He didn't give up. He looked for him. He stalked [Alvarado] the rest of the day, found him in the north end later on and blew up his car.

"Now, if you believe that the next day they made friends—that's what [Alvarado] says. Remember, [Roberto Hernandez] says, 'I was down the block and saw him give $1500 to [Alvarado] for the car.' [Alvarado] says it was $800 for the car. If you believe they made friends after that, then I'll sell you the Brooklyn Bridge, ladies and gentlemen. Those guys hated each other. Okay. And these are the guys with the motive to lie here."

[22] In his main brief, the defendant argued: "In its first closing argument, the state used the substance of Rivera's statement, admitted to show his fear, for its truth—that Rivera met with Arciniega hours before Rivera was killed and that the defendant hired Arciniega to kill Rivera."

of the testimony from the police officer who first responded to the scene of the victims' death. He also stated that there was no dispute that the victims had died as a result of gunshot wounds by homicide and that the only issue in the case was the identity of the person or persons who had killed the victims. He discussed the biases, prejudices and motives of the witnesses who testified and argued that the defendant, a drug dealer, had a motive to kill the victims because Rivera was intruding on his territory to sell his own drugs. He also set forth the evidence that he considered uncontradicted. He made two references to Rivera and the Latin Spirit Club.

The prosecutor argued: "On the night of the killing, you have testimony presented [that] there was a meeting at the Latin Spirit with Jose Arciniega. That is not [contradicted] by another witness.

"And then you have the testimony of Mr. Hernandez and Mr. Alvarado. Now, you recall Mr. Alvarado's testimony on the first day of examination, when I was speaking with him. He was pressured into this statement. The so-called August 14 statement, where he lays out the money of $10,000 to pay Arciniega, but he might work cheaper, and the defendant admitting he committed the crimes, that he had the beef with Mr. Rivera. Remember he was pressured? You hear any other evidence he was pressured? Matter of fact, you heard the opposite of [Robert] Johnson, the patrol officer was with him the whole time. He wasn't pressured. If you take a look at statement, I believe state's exhibit eighty-one, when he spoke with the police, he said, 'I'm here to tell the truth.' " Contrary to the defendant's assertion, we do not consider the juxtaposition of these arguments to imply a substantive use of Rivera's statement. The first paragraph represents a statement of fact. The second is an attack on the defendant's having elicited evidence that Alvarado was *pressured* to give the police a statement.

The prosecutor thereafter, in an apparent anticipation of the argument the defendant would make to discredit the state's witnesses, contended: "You have a right to consider [that] no witnesses came into court today and said that the accused was at a specific place in the city of Bridgeport, or as [defense counsel] said on opening statement, a thousand miles away at the time of these crimes. You know that the accused has told people that he was [at the scene] with Jose Arciniega. You know Jose Arciniega, within a couple of hours of the homicides, was meeting with the victim. And Mr. Rivera came out of that meeting with people with guns and camouflage shaken up and upset. You heard the people describe his emotional state. You have a right to consider those factors." Evidence was presented at trial that the defendant and Arciniega were at the scene of the murders. As to the reference to the meeting at the Latin Spirit Club, the prosecutor emphasized Rivera's emotional state.

Before closing, the state reminded the jurors that they had the right to rely on both direct and circumstantial evidence. It also told them that the defendant was the person with the motive and opportunity to kill the victims. It also recapped the testimony of the detective, Nilan, that the defendant early on tried to blame the victims' murders on two men from New York.

The following argument made by defense counsel is also relevant to our analysis. "Edwin Bonilla, Maggie Montes, okay. This crazy thing they claim happened over at Latin Spirit. Do you believe that? Do you believe that actually happened? You got Bonilla. How many stories [did] he tell? . . . He says he sees Magdiel Rivera go into a bathroom with a guy who is bald. And the guy who is bald told him, 'I been hired to kill you, but I'm not going to do it. I'm going to turn the gun on [the defendant].' Okay. . . . [W]hat's the significance of that? If anything, it tells you the guy is obviously

making up some kind of a story, already trying to do something to curry favor with [Rivera]. Why is that automatically evidence, and how could you believe it happened?"

In its rebuttal argument, the state mentioned October 14, 1999, and Bonilla in a recitation of evidence in the case. "October 14, the Latin Spirit. The Latin Spirit. Down on November 2, 1999, based on defendant's exhibit C, which you will have with you, . . . Bonilla gives his first statement, and he mentioned the name of [the defendant]. He mentioned [the defendant] was hired to kill someone. [Defense counsel] alluded to this in his closing argument." A prosecutor may respond to the argument of defense counsel during rebuttal. *State v. Fauci*, 87 Conn. App. 150, 173–76, 865 A.2d 1191, cert. granted on other grounds, 273 Conn. 921, 871 A.2d 1029 (2005).

In summation, the state argued its theory: "This is a case, ladies and gentlemen, where the defendant had the motive to kill the victims; that acting with that motive, he armed himself. And you might recall, they set up a drug deal with Alvarado[23] and then found out where these men would be. He then went over to that place, shot and killed two men by the use of a firearm, and in doing so, that is that shooting with the firearm, intended to cause their death. Two of them killed at the same time, in the course of the same transaction. And in the course of that crime, they took the property of the victims, and that's the robbery."

On appeal, the defendant claims that the state's closing argument was improper, but he failed to object to the argument at trial and asks us to review his claim pursuant to *State v. Stevenson*, 269 Conn. 563, 572–73, 849 A.2d 626 (2004), citing the factors to be considered

---

[23] Query whether the prosecutor misspoke, intending to have said Arciniega.

as those established in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). Before we address the *Williams* factors, we must determine whether the final argument of the prosecutor was, in fact, misconduct. See *State* v. *Jacobson*, 87 Conn. App. 440, 456–57, 866 A.2d 678, cert. granted on other grounds, 273 Conn. 928, 873 A.2d 999 (2005). On the basis of our close reading of the transcript of the parties' final arguments, we conclude that the prosecutor was not guilty of misconduct, as his arguments cannot be construed as having used Rivera's statement for substantive purposes.

"First, we determine whether the challenged conduct was improper." (Internal quotation marks omitted.) Id. "[B]ecause closing arguments often have a rough and tumble quality about them, some leeway must be afforded to the advocates in offering arguments to the jury in final argument. [I]n addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument." (Internal quotation marks omitted.) Id., 457.

Just as we do not review the court's instruction to the jury in isolation, we must consider the arguments of counsel in the context of the entire trial. A sentence here and a sentence there taken out of context may appear to be misleading or without the benefit of facts in evidence. Again, we note that words on the written page cannot approximate passion, tone of voice, facial expressions and gestures. When defense counsel fails to object, especially defense counsel who tried the case aggressively, we take note. "The defendant, therefore, presumably did not regard those remarks . . . as seriously prejudicial at trial." (Internal quotation marks omitted.) *State* v. *Chasse*, 51 Conn. App. 345, 356, 721 A.2d 1212 (1998), cert. denied, 247 Conn. 960, 723 A.2d 816 (1999).

"While a prosecutor may argue the state's case forcefully, such argument must be fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Consequently, the state must avoid arguments which are calculated to influence the passions or prejudices of the jury, or which would have the effect of diverting the jury's attention from [its] duty to decide the case on the evidence." (Internal quotation marks omitted.) Id., 357–58. "Closing arguments of counsel, however, are seldom carefully constructed in toto before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear. While these general observations in no way justify prosecutorial misconduct, they do suggest that a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." (Internal quotation marks omitted.) Id., 358.

In his brief, the defendant claims that the language of the state's final argument "wrongly argued to the jury that Rivera's statement showed that the defendant hired Arciniega to kill Rivera," thereby arguing facts not in evidence. The defendant also claims that the state argued that he "sent Alvarado and Hernandez to kill Rivera, although there was no evidence to support his claim." On the basis of our review of the state's final argument, we disagree with the defendant's construction of it. Most certainly, the prosecutor did not use the specific language attributed to him by the defendant. The prosecutor argued evidence presented at trial that supported the state's theory of the case that the defendant had a motive to kill the victims and asked the jury to question the rationale of the defendant's argument on the basis of the evidence in the case. It was the defendant's closing argument that made the most direct

reference to Rivera's statement, and then demonstrated its lack of credibility because Arciniega did not shoot the defendant and thereby thoroughly discredited the statement. For these reasons, we conclude that the prosecutor was not guilty of misconduct.

The judgment is affirmed.

In this opinion STOUGHTON, J., concurred.

SCHALLER, J., concurring. I agree with the result in this case. The majority, however, assumes *"without deciding* that the defendant [Luis Galarza] was denied the right to cross-examine the witness"; (emphasis added); presumably because Edwin Bonilla's testimony about the out-of-court statement by one of the victims, Magdiel Rivera, Jr., in which Rivera had repeated what Jose Arciniega had said to him, was inadmissible. I write separately for the sole purpose of stating my view that Bonilla's testimony repeating Rivera's statement clearly should not have been admitted under the Connecticut Code of Evidence.

The state initially offered Bonilla's testimony concerning Rivera's statement as a declaration against Arciniega's penal interest. The state argued that the statement showed that Rivera and the defendant were involved in a territorial dispute and that the defendant had a motive to kill Rivera. The state then abandoned that rationale and adopted the spontaneous utterance exception suggested by the trial court as a ground for admitting the statement. The state argued curiously that the statement was not offered to prove its truth but to prove the victim's state of mind. The defendant objected on the ground that the statement was double hearsay and did not fall within any hearsay exception, including spontaneous utterance. The court admitted the statement into evidence as a spontaneous utterance in order

to prove Rivera's state of mind. During Bonilla's testimony, the court informed the jury that the statement was not being offered as proof of the truth of the statement but as proof of the victim's mental condition and state of mind when he made the statement. In the course of instructing the jury, the court explained further that the statement was admitted as a spontaneous utterance. The court noted: "This is an exception to the hearsay rule. It was not offered for its truth but for the witness' then existing state of mind."

The defendant correctly points out that both the state's offer and the court's ruling and instructions contain contradictions. Under our rules of evidence, spontaneous utterances are admitted for the truth of the matter asserted and need not be limited to proving state of mind. See Conn. Code Evid. § 8-3 (2); *State* v. *Arluk,* 75 Conn. App. 181, 187, 815 A.2d 694 (2003) (under the spontaneous utterance exception, "[h]earsay statements, otherwise inadmissible, may be admitted into evidence to prove the truth of the matter asserted therein" [internal quotation marks omitted]). Conversely, a statement offered for a nonhearsay purpose, such as proving a person's state of mind, need not be designated as a spontaneous utterance. A nonhearsay purpose for an offer does not rely on an exception to the hearsay rule. See C. Tait, Connecticut Evidence (3d Ed. 2001) § 8.7 ("Any statement that is not offered to prove the matter asserted is not hearsay. . . . If the statement is *not offered to prove its contents,* the offeror must satisfy the court that the statement itself is relevant for some other purpose."); *State* v. *Rivera,* 40 Conn. App. 318, 324–25, 671 A.2d 371 (1996) ("An out-of-court statement is not hearsay . . . if it is offered to illustrate circumstantially the declarant's then present state of mind, rather than to prove the truth of the matter asserted. . . . [S]uch an out-of-court statement by a declarant would only be admissible to show his

state of mind where his mental state is relevant." [Citations omitted; internal quotation marks omitted.]). Notwithstanding the confusion in the trial court, I suggest that Bonilla's testimony as to Rivera's statement was not properly admissible as a spontaneous utterance or, for that matter, to prove Rivera's state of mind, which was irrelevant to the issues in the case.[1]

I note, at the outset, that Bonilla's testimony regarding Rivera's out-of-court statement, in which Rivera repeated what Arciniega had said to him, constituted hearsay within hearsay. As such, Bonilla's testimony was "admissible only if each part of the combined statements [were] independently admissible under a hearsay exception." Conn. Code Evid. § 8-7; see also *State* v. *Lewis*, 245 Conn. 779, 802, 717 A.2d 1140 (1998) ("[w]hen a statement is offered that contains hearsay within hearsay, each level of hearsay must itself be supported by an exception to the hearsay rule in order for that level of hearsay to be admissible"). In my view, these statements are inadmissible.

It is axiomatic that "[a]n out-of-court statement offered to prove the truth of the matter asserted is hearsay and is generally inadmissible unless an exception to the general rule applies . . . ." (Internal quotation marks omitted.) *State* v. *Gregory C.*, 94 Conn. App. 759, 770, 893 A.2d 912 (2006). Pursuant to Conn. Code Evid. § 8-3 (2), a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" constitutes a spontaneous utterance and is an exception to the general hearsay rule. The spontaneous utterance exception is well established and dictates that "[h]earsay statements, otherwise inadmissible, may be admitted into evidence to prove the truth of the matter

---

[1] On the basis of the nature of the statements offered, § 8-3 (4) of the Connecticut Code of Evidence is not implicated.

asserted therein when (1) the declaration follows a startling occurrence, (2) the declaration refers to that occurrence, (3) the declarant observed the occurrence, and (4) the declaration is made under circumstances that negate the opportunity for deliberation and fabrication by the declarant. . . .

"Whether an utterance is spontaneous and made under circumstances that would preclude contrivance and misrepresentation is a preliminary question of fact to be decided by the trial judge. . . . The trial court has broad discretion in making that factual determination, which will not be disturbed on appeal absent an unreasonable exercise of discretion." (Citations omitted; internal quotation marks omitted.) *State* v. *Gregory C.*, supra, 94 Conn. App. 770–71.

In the present case, the circumstances of Rivera's repeating what Arciniega had told him did not fall within the traditional spontaneous utterance rule, which requires that the utterance be "spontaneous and unreflective and made under such circumstances as to indicate absence of opportunity for contrivance and misrepresentation." (Internal quotation marks omitted.) *State* v. *Kelly*, 256 Conn. 23, 60, 770 A.2d 908 (2001). Rivera, immediately after his conversation with Arciniega in the restroom, left the restroom and recounted to Bonilla what he had been told. According to Bonilla, however, "[Rivera] didn't want to talk. I had to push [it] out of him." Although Rivera was "acting funny" and may have been upset by Arciniega's information, the episode did not involve circumstances that give rise to the exception for spontaneous utterances. In fact, as Bonilla implicitly acknowledged, there was nothing spontaneous about the statement; rather, he had to encourage Rivera to speak. Moreover, the admission of the details of the information that Arciniega had told Rivera was not needed to prove Rivera's state of mind, which was that he was fearful, if, indeed, his state

of mind was relevant at all in this case. Rather, it is apparent that the only plausible purpose of the offer was to implicate the defendant by establishing that he had hired Arciniega to kill Rivera, not simply to prove Rivera's state of mind.

In conclusion, the offered statement was, indeed, hearsay upon hearsay and was not admissible under our rules of evidence. I agree with the majority's analysis that admission of the statement was harmless beyond a reasonable doubt.

For the foregoing reasons, I respectfully concur.